UNITED MISSOURI BANK OF KANSAS
CITY, N.A., Plaintiff,

v.

Hon. John C. DANFORTH,
Defendant.

UNITED MISSOURI BANK OF ST.
LOUIS, N.A., Plaintiff,

v.

Hon. John. C. DANFORTH,
Defendant.

FIRST NATIONAL BANK OF KANSAS
CITY, Plaintiff,

v.

Hon. John C. DANFORTH,
Defendant.

COMMERCE BANK OF KANSAS
CITY, N.A., Plaintiff,

v.

Hon. John C. DANFORTH,
Defendant.

The BOATMEN'S NATIONAL BANK OF
ST. LOUIS, Plaintiff,

v.

Hon. John C. DANFORTH,
Defendant.

FIRST NATIONAL BANK OF
ST. LOUIS, Plaintiff,

v.

Hon. John C. DANFORTH,
Defendant.

MERCANTILE TRUST COMPANY NA-
TIONAL ASSOCIATION,
Plaintiff,

v.

Hon. John C. DANFORTH,
Defendant.

Nos. 75 CV 38–C to 75 CV 41–C, 75 CV
43–C, 75 CV 47–C and 75 CV 50–C.

United States District Court,
W. D. Missouri, C. D.

April 29, 1975.

William H. Sanders, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., for Commerce Bank of Kansas City, N.A.

Joe Anderson, Asst. Atty. Gen., for defendant in all cases.

Lewis, Rice, Tucker, Allen & Chubb, St. Louis, Mo., for Boatmen's National Bank.

Hugh McPheeters, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for First National Bank in St. Louis.

David F. Ulmer, Thompson & Mitchell, St. Louis, Mo., for Mercantile Trust Co. Nat. Ass'n.

Samuel J. Molby, Robert C. Canfield, Watson, Ess, Marshal & Enggas, Kansas City, Mo., for United Missouri Bank of Kansas City, N.A. and United Missouri Bank of St. Louis, N.A.

James W. Starnes, Lawrence R. Brown, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., for the First National Bank of Kansas City, A National Banking Ass'n.

## FINDINGS, OPINION AND JUDGMENT

ELMO B. HUNTER, District Judge.

Plaintiffs in these consolidated cases are all national banking associations created and operating under the National Banking Act, 12 U.S.C. § 21 et seq., and all located in the State of Missouri. They have brought the above-styled individual actions against John C. Danforth, Attorney General for the State of Missouri, seeking a declaratory judgment and an injunction against the defendant's commencing and prosecution of *quo warranto* proceedings for plaintiffs' alleged violation of the usury provisions of the Missouri Retail Credit Sales Act, (Sections 408.250–408.370 RSMo., V.A.M.S. as amended on August 13, 1974).

These actions, which have been consolidated for all purposes, were instituted as a result of similar letters which were sent to plaintiffs under date of January 20, 1975 from the Office of the Missouri

Attorney General. These letters, identical in all material respects, provided as follows:

"On August 13, 1974, S.B. 427 (2d. Reg.Sess., 77th Gen.Assem.) took effect. Section 408.250(13) was amended by the provisions of that Act. We have held in Official Opinion No. 63, issued October 23, 1974 (Gralike), that the amended definition contained in subsection 13 of Section 408.250 in S.B. 427, brings the so-called "bank credit cards" within the provisions of the Retail Credit Sales Act (408.250 et seq.). A copy of this opinion is attached for your information.

"Information has been presented to us which indicates that your bank as a participant in a bank credit card system continues to assess a finance charge in excess of the rates specified in Section 408.300.2, RSMo., of the Retail Credit Sales Act, which constitutes a violation of Section 408.370, RSMo.

"Section 531.010, RSMo., empowers the Attorney General of Missouri to exhibit an information before the Circuit Court where he finds that any person has exceeded its corporate franchise. The continuing violation by your bank of the provisions of Section 408.300, RSMo., constitutes an act in violation of your corporate charter and subjects the charter to an action in *Quo Warranto* pursuant to Section 531.050, RSMo. You are hereby informed per this letter and attachments thereto that on or after February 3, 1975, the Attorney General intends to exhibit an information in *Quo Warranto* in the appropriate forum. I direct your attention to Section 408.-370.3, RSMo. which enables a person in violation of any provision of the retail credit sales Act to cure the same by correction within ten days from the date of notice of the violation. Should we receive notice within ten days from the date you receive this letter that your bank has discontinued its violation of Section 408.300.2, RSMo., we shall consider withdrawing our threat of litigation."

These actions filed January 31–February 10, 1975 seek a declaratory judgment that Sections 408.250–370 RSMo. as amended by S.B. 427 (Missouri Retail Credit Sales Act) are not applicable to plaintiffs' bank credit card systems, by reason of the provisions of 12 U.S.C. § 85, and that plaintiffs are entitled to charge that rate of interest on their bank credit cards as permitted by Sections 408.100–408.200, RSMo. (Missouri Small Loan Act). Plaintiffs also seek to enjoin the defendant from exhibiting an information in the nature of *Quo Warranto* against plaintiffs in any Circuit Court of the State of Missouri for the alleged violations of the usury provisions of the Missouri Retail Credit Sales Act on account of bank credit card operations.

It is plaintiffs' primary contention herein that Section 85 of Title 12, United States Code authorizes them as national banks to charge and collect interest on loans or credit at the maximum rate permitted by state law to any competing state chartered or licensed lender on similar loans or credit. They assert that lenders in Missouri licensed under Chapter 367 RSMo. are permitted by State law to extend credit similar to plaintiffs' bank credit card operations and charge rates under the Missouri Small Loan Act, and that therefore plaintiffs, as national banks, are entitled to charge those rates permitted to Chapter 367 licensees (small loan companies and pawnbrokers). It is further asserted that to the extent that the Missouri Retail Credit Sales Act conflicts with their interpretation of Section 85 of Title 12 and the Small Loan Act it is inapplicable to plaintiffs by virtue of the Supremacy Clause. Plaintiffs assert federal jurisdiction under the provisions of Sections 2201, 1331(a), and 1337 of Title 28, United States Code. Defendant has challenged the jurisdiction of the Court and asserts that if jurisdiction does lie that this is a matter to be determined by a

three-judge Court under the provisions of 28 U.S.C. § 2281.

Full trial to the Court in these consolidated cases was held on February 24, 1975.

The parties have entered into extensive stipulations in this cause. From those stipulations and the evidence adduced, the Court makes the following findings of fact.

1. Each of the plaintiffs herein are National Banking Associations created and operating under the National Banking Act (12 U.S.C. § 21 et seq.), an Act of Congress. First National Bank of Kansas City, Commerce Bank of Kansas City, N.A., and United Missouri Bank of Kansas City, N.A., are located in Kansas City, Missouri. The remaining plaintiffs-banks are located in St. Louis, Missouri.

2. The defendant, John C. Danforth, is a resident of Jefferson City, Missouri, and was served with process herein on February 4, 1975. He is now and was at all relevant times, the duly elected and acting Attorney General of the State of Missouri. Venue is proper in this Court.

3. Plaintiffs, and each of them, are engaged, among other things, in loaning money in Missouri through bank credit card operations at interest rates that are authorized by Missouri Law under the Missouri Small Loan Act (Sections 408.100–408.200, RSMo. 1969), but which may be in excess of the rates permitted by the Missouri Retail Credit Sales Act (Sections 408.250–408.370, RSMo. 1969 as amended by Senate Bill No. 427, 77th General Assembly, 2d Reg.Sess.).

4. Plaintiffs and other lenders in Missouri in other than credit card operations are making loans and charging interest authorized by the Missouri Small Loan Act, some of which loans are made for the purpose of purchasing goods and services.

5. The defendant contends and plaintiffs deny that the Missouri Retail Credit Sales Act is applicable to the plaintiffs' credit card operations and a controversy and dispute exists between the parties on such issue, as shown by the letter dated January 20, 1975 to each of the plaintiffs from defendant, and as shown by defendant's Official Opinion No. 63 dated October 23, 1974.

6. The charges in interest rates by plaintiffs under their respective credit card agreements so as to bring such rates within that permitted by the Retail Credit Sales Act as interpreted by defendant would result in a reduction of charges and a monetary loss to each of the plaintiffs in excess of $10,000.00, exclusive of interest and costs. That if the reductions in interest rates demanded by defendant are not made by plaintiffs, and in the event of the threatened *Quo Warranto* actions by defendant, plaintiffs would suffer other injuries to each in excess of $10,000.00, exclusive of interest and costs. Plaintiffs have no adequate remedy at law should such proceedings be wrongful in that the extent of damages would be difficult, if not impossible, to determine and the defendant is not financially able to respond to the extent that such damages might be incurred.

7. The Comptroller of the Currency is charged with the duties of regulating National Banks. In 1936, he rendered an interpretive opinion which is now codified as 12 C.F.R. § 7.7310 (1972). That opinion provides:

> "(a) A national bank may charge interest at the maximum rate permitted by State law to any competing State-chartered or licensed lending institution. If State law permits a higher interest rate on a specified class of loans, a national bank making such loans at such higher rates is subject only to the provisions of State law relating to such class of loans that are material to the determination of the interest rate. For example, a national bank may lawfully charge the highest rate permitted to be charged by a state licensed small loan company or morris plan bank, without being so licensed.

"(b) A national bank located in a State the law of which denies the defense of usury to a corporate borrower may charge a corporate borrower any rate of interest agreed upon by such borrower."

8. The present status quo in these proceedings shall be maintained until the final judgment of the Court herein.

9. The Credit card agreements now used by the respective plaintiffs are stipulated to be received in evidence as part of the stipulation of the parties. Those agreements between the bank and the holder of the bank credit card provide in general that the bank will advance amounts necessary to pay for purchases by the holder from an authorized merchant, or for cash advances made by a duly authorized bank, up to the amount of the holder's line of credit. The holder agrees to pay for the advances on a monthly billing cycle, by payment of a minimum percentage of the monthly balance, and to pay a finance charge on the unpaid balance. Depending on the type of credit card, the holder may be required to pay a membership fee to obtain the card.

*Jurisdiction*

Although there exists herein an actual controversy between the parties regarding the application of the Missouri Retail Credit Sales Act to these bank credit card transactions, and regarding the effect of 12 U.S.C. § 85 as it may pertain to that application so as to satisfy the requirements of 28 U.S.C. § 2201, that statute does not vest the Court with subject matter jurisdiction. Thus, the initial issue to be determined in this cause is the presence of federal jurisdiction. Section 85 of Title 12, United States Code, provides in pertinent part:

"Rate of interest on loans, discounts and purchases"

"Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under this chapter. . . ."

It has been established law since the decision in Tiffany v. National Bank, 85 U.S. (18 Wall.) 409, 21 L.Ed. 862 (1873), that Section 85 of Title 12 places national banks in a position of limited advantage over state banks by allowing them to charge interest at the highest rate applicable under state law to lenders generally in each respective state, not necessarily at the rate applicable to state banks which might be lower. See First National Bank v. Nowlin, 509 F.2d 872 (8th Cir. 1975).

The purpose of Section 85 is to adopt the state law, relating to interest rates permitted, to permit national banks to charge the rate of interest allowed to competing lenders in the state, and to guard against unfriendly federal-state legislation or ruinous competition with state chartered or licensed lenders. This interpretation of Section 85, commonly referred to as "the most favored lender policy" puts national banks on an equal footing with the most favored lenders in the state without giving them an unconscionable and destructive advantage over all state lenders. The statute prevents state legislation which purports to give state banks or possibly any state lender advantages over national banks. First National Bank v. Nowlin, *supra*. Tiffany v. National Bank, *supra*. Although Section 85 incorporates by reference state statutes and decisional law in determining whether interest charged by a national bank is usurious, national

banks are subject to the paramount authority of the United States and the question of whether a national bank is committing usury is ultimately a question of federal law. See Haas v. Pittsburgh National Bank, 60 F.R.D. 604 (W.D.Pa.1973). Furthermore, national banks are not subject to state penalties for usury, rather these penalties are governed exclusively by the National Banking Act. Evans v. National Bank, 251 U.S. 108, 40 S.Ct. 58, 64 L.Ed. 171 (1919); see McCollum v. Hamilton National Bank, 303 U.S. 245, 58 S.Ct. 568, 82 L.Ed. 819 (1938).

In view of the authorities mentioned above, this controversy clearly is one arising under the laws of the United States. The parties have stipulated that the amount in controversy in each of these actions is in excess of $10,000.00. This Court therefore has jurisdiction under Section 1331(a) of Title 28, United States Code. See First National Bank v. Nowlin, 374 F.Supp. 1037 (E.D.Ark. 1974), aff'd, 509 F.2d 872 (8th Cir. 1974).[1]

Because the question here presented is, at most, one of a statutory conflict grounded in the Supremacy Clause of the United States Constitution, a three-judge court is not required. Swift & Company v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965).[2]

*The Applicability of the Missouri Retail Credit Sales Act*

The Missouri Retail Credit Sales Act, as amended, provides the maximum rates of interest which may be charged by a "retail seller" or "seller" under a "retail time contract" or "retail charge agreement." [3] The maximum rates permitted under the Retail Credit Sales Act are in some situations less than that permitted under the Missouri Small Loan Act.[4]

It is the contention of the defendant, and the position taken in Official Opinion No. 63, issued October 23, 1974 that the Retail Credit Sales Act is applicable to transactions involving the purchase of retail goods and services by means of bank credit cards by virtue of the definition of "retail seller" or "seller" as contained in subsection (13) of Section 408.-250 RSMo. as amended by Senate Bill No. 427. That subsection provides as follows:

(13) "'Retail seller' or 'seller' means a person who regularly sells or offers to sell goods or services to retail buyers. *The term also includes a person*

1. Jurisdiction may also be founded on 28 U.S.C. § 1337 as the National Banking Act, and particularly Section 85 of Title 12, is an Act regulating commerce within the provisions of Section 1337. See Burns v. American Bank & Trust Co., 479 F.2d 26 (8th Cir. 1974).

2. Those plaintiffs which asserted that the Missouri Retail Credit Act is in violation of the Commerce Clause of the Constitution abandoned those claims at the trial of this cause. Even absent such abandonment, those claims are too insubstantial to support the jurisdiction of a three-judge court. See Swift & Company v. Wickham, *supra*.

See also, MTM, Inc., v. Baxley, — U.S. —, 95 S.Ct. 1278, 43 L.Ed.2d 636 (1975).

3. The terms "rates of interest" and "interest" as used in this opinion include the terms "finance charge" and "time charge" as defined in plaintiffs' credit card agreements and the Retail Credit Sales Act. See § 408.-250(17) as amended.

4. For example, under the Retail Credit Sales Act the maximum permitted charge under a retail charge agreement on the unpaid balance in excess of five hundred dollars is seven and one-half percent per ten dollars per month on that portion in excess of five hundred dollars, and fifteen cents per ten dollars per month on the unpaid balance which is less than five hundred dollars. Under the Small Loan Act, interest on loans not exceeding five hundred dollars shall not be more than fifteen dollars per one hundred dollars per annum, and shall not exceed 2.218% per month on the unpaid principal balance. On loans in excess of five hundred dollars under the Small Loan Act, the lender may charge on the portion of the unpaid principal balance in excess of five hundred dollars the rate of 8% per annum. Sections 408.100, 408.200, and 408.300 RSMo.

*who regularly grants credit to retail buyers for the purpose of purchasing goods or services from any person, pursuant to a retail charge agreement, but shall not apply to any licensee under Chapter 367 RSMo.*" (emphasis added).

"Credit", as defined in the Retail Credit Sales Act, means:

"The right granted by a creditor to a debtor to defer payment of a debt or to incur debt and defer its payment. It includes the right to incur debt and defer its payment pursuant to the use of a card, plate, coupon book, or other credit confirmation or identification device or number or other identifying description."

The Retail Credit Sales Act further defines "Retail Charge Agreement" and "Retail Time Transaction" as follows:

" 'Retail Charge Agreement' means an agreement entered into in this state between a retail seller and a retail buyer prescribing the terms of retail time transactions to be made from time to time pursuant to such agreement, and which provides for a time charge to be computed on the buyer's total unpaid balance from time to time."

" 'Retail time transaction' means a contract to sell or furnish or the sale of or furnishing of goods or services by a retail seller to a retail buyer for which payment is to be made in one or more deferred payments under and pursuant to a retail time contract or retail charge agreement."

Unlike the Missouri Small Loan Act, the Retail Credit Sales Act makes no reference to "interest rates" but rather utilizes the term "time charge" which is defined as follows:

" 'Time charge' means the amount, however denominated or expressed, in excess of the cash sale price under a retail charge agreement (price of goods or services if cash sale) or the principal balance under a retail time contract which a retail buyer contracts to pay or pays for goods or services. It includes the extension to the buyer of the privilege of paying therefor in one or more deferred payments."

Among other things, the Retail Credit Sales Act specifies the terms required to be included in a "retail charge agreement" and "retail time contract" and limits the "time charges" which may be charged under the "agreements" and "contracts." The "time charge" permitted under a "retail charge agreement" differs from that permitted under a "retail time contract". See Section 408.-300 RSMo.

Although the parties have raised the question of the correctness of the Opinion of the Attorney General which states that plaintiffs are "retail sellers" and their bank credit card operations are "retail time transactions" and "retail charge agreements" as those terms are defined by the Retail Credit Sales Act, the Court does not deem this determination of Missouri Law necessary to the resolution of the instant suit.[5] The Court thus indicates no opinion on the correctness or incorrectness of the Opinion as it may pertain to similar transactions by persons or entities other than national banks. For the purposes of this opinion, it will be assumed that the *type* of transaction evidenced by plaintiffs' bank credit card operations does come within the provisions of the Retail Credit Sales Act as a "retail time transaction" and "retail charge agreement" and therefore is subject to the limitations on "time charges" contained in the Act.

Defendant does not seriously contest that Section 85 of Title 12, United States Code permits national banks to charge

5. The core of the question does not so much involve the question of whether or not plaintiffs are included in the definition of "seller" or "retail seller" under the Act, but rather involves a determination of whether the bank credit card operations and agreements constitute a "retail charge agreement" which prescribes the terms of "retail time transaction" as those terms are defined in the Act. See White v. Anderson, 164 Mo.App. 132, 147 S.W. 1122 (K.C.App.1912).

the highest rate of interest permitted to competing lenders on similar "loans" by state law. Rather, defendant contends that the Missouri Retail Credit Sales Act as amended does not regulate "traditional loans and the interest rates applicable thereto," or traditional banking activities, but merely regulates the "selling and financing of retail credit purchases of goods and services." Therefore, it is argued, the Retail Credit Sales Act does not regulate "interest rates" on a specified class of "loans" as the term is used in Section 85 of Title 12, United States Code, but applies only to transactions involving the purchase of goods or services on credit, whether the seller be a national bank, state bank, or merchant. In support of this argument, defendant refers to the traditional distinction in Missouri law between loans of money for the purpose of purchasing goods and services and the sale of goods, services, or merchandise on credit.

It has been held by Missouri Courts that a sale of goods or merchandise on credit involving a time-price differential is not a "loan" under Missouri law and therefore not subject to limitations on usury imposed by state law.[6] See Wyatt v. Commercial Credit Corporation, Mo.App., 341 S.W.2d 348 (K.C.App. 1960); see also, General Motors Acceptance Corp. v. Weinrich, 218 Mo.App. 68, 262 S.W. 425 (K.C. App. 1924); Securities Investment Co. v. Hicks, Mo. App., 444 S.W.2d 6 (Spgfld. Ct.App. 1969). To a degree, the Missouri Retail Credit Sales Act preserved this distinction in that it provides different permitted charges for the extension of credit in connection with a retail sale and different penalties for violation of those provisions than is provided by Missouri Statutes pertaining to loans of money and usury.

Prior to the enactment of the original Missouri Retail Credit Sales Act in 1961, Missouri law did not regulate the interest rate, time-price differential, or "time charge" which could be charged in connection with the direct sale of goods, services, or merchandise with payment deferred over a period of time. This lack of regulation grew out of Missouri Court decisions holding that a credit sale involving a time-price differential was not a "loan" but was a "sale" and therefore not subject to statutes against usury. See General Motors Acceptance Corporation v. Weinrich, *supra* at 428. The enactment of the Missouri Retail Credit Sales Act in 1961 filled this void by imposing certain requirements on retail credit sales of goods and services and by limiting the time-price differential or "time charge" which could be charged by the retail seller. Sections 408.250–370 RSMo. (1969), Laws 1961, p. 638.

The argument of the defendant thus comes down to the assertion that if state statute and decisional law does not refer to or deem a particular transaction a "loan" as the term is used in the statute and interpreted by the state courts, then the transaction cannot be deemed to come within the term "loan" as utilized in Section 85 of Title 12, United States Code, and in Tiffany v. National Bank, *supra*.

The Court is in agreement with the assertion of the defendant that Missouri decisional law has traditionally distinguished loans of money from the extension of credit in connection with a retail sale. The decision in Wyatt v. Commercial Credit Corporation, *supra*, one of the most recent Missouri decisions noting this distinction was authored by the undersigned judge while serving on the Kansas City Court of Appeals. However, the Court does not agree with the defendant's conclusion that that traditional distinction removes transactions governed by the provisions of the Missouri Retail Credit Sales Act

6. The "time-price differential" in a classic retail credit sale is the difference between the price charged on the credit sale and that which would be charged if the identical sale were for cash.

from the purview of Section 85 of Title 12, United States Code.

The conclusion that can be drawn from the traditional distinction in Missouri law between "loans" of money and the extension of "credit" in connection with a retail sale is that under Missouri law these are deemed to be different classes of *debt.* Notably, Section 85 of Title 12 is not limited to permitting national banks to charge the highest rates of interest permitted to competing lenders under state law on "loans". Rather the statute provides in pertinent part:

> "Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or *other evidences of debt,* interest at the rate allowed by the laws of the State . . . .." (Emphasis added.)

Notwithstanding the Missouri decisional law which establishes that a retail credit sale of goods or services is not a "loan" within the meaning of the Missouri usury statutes, it cannot be disputed that a transaction governed by the provisions of the Missouri Retail Credit Sales Act in which "credit", as defined in that Act, is granted to a retail buyer involves the incurring of a "debt" within the context of the Act and as the term is generally used.[7] The "retail time transactions" and "retail charge agreements" made in connection with these credit transactions constitute "evidence of debt" within the meaning of Section 85 of Title 12. Section 85 of Title 12 permits plaintiffs as national banks to charge the rate of interest on evidences of debt as is permitted by Missouri Law to competing lenders in the state on similar evidences of debt. The Court therefore concludes that transactions encompassed by the provisions of the Missouri Retail Credit Sales Act, i. e., "retail time transactions" come within the purview of Section 85 as a class of debt, or "loans" in the broad sense of the term.[8] The question remaining in this cause is whether Missouri Law permits lenders competing with plaintiffs to charge a higher rate of interest than permitted by the Retail Credit Sales Act on loans or evidences of debt similar to those governed by that Act.

The stipulations and evidence in this cause establishes that Small Loan Companies licensed under Chapter 367 RSMo. do compete with plaintiffs in the field of consumer credit, in that those licensees make loans of money to retail buyers for the purpose of purchasing goods and services. Although there is no evidence that these competing lenders are engaging in the particular method of extending credit as is evidenced by plaintiffs' bank credit card operations, it is clear that the consumer credit loans made by Chapter 367 licensees are similar to plaintiffs' extensions of credit through bank credit cards. In both instances, the borrower or buyer incurs a debt for the purpose of purchasing retail goods or services and defers payment over a period of time. Consumer credit loans by Chapter 367 licensees may, like plaintiffs' extension of credit under their bank credit cards, be unsecured. Section 367.100 RSMo. (1969).

By expressly excepting licensees under Chapter 367 (Small Loan Companies) from the definition of "retail seller" or "seller" as defined in the Missouri Retail Credit Sales Act, the Act is thereby made inapplicable to consumer credit loans made by small loan companies licensed under Chapter 367. Thus, even though a small loan company licensed un-

7. "Debt" in the context of the Retail Credit Sales Act, and as generally used in the context of credit means "a sum charged as due and owing", Black's Law Dictionary (—— Ed. ——). It is a fixed and certain obligation, as opposed to something payable upon a contingency. Cf. Grand River Tp., DeKalbe County v. Cooke Sales & Serv. Mo., 267 S.W. 2d 322 (1954).

8. See Acker v. Provident National Bank, 373 F.Supp. 56 (E.D.Pa.1974); Haas v. Pittsburgh Nat. Bank, 381 F.Supp. 801 (W.D.Pa. 1974).

der Chapter 367 may engage in a consumer credit transaction which in all respects comes within the provisions of the Retail Credit Sales Act, the Act is inapplicable to the transaction by virtue of the fact that the "seller" is a Chapter 367 licensee, and the transaction is governed by the Missouri Small Loan Act. As previously stated, the rates of interest permitted under the Small Loan Act in some situations are in excess of the "time charge" permitted under the Retail Credit Sales Act.

The question presented herein therefore does not directly relate to the correctness or incorrectness of the defendant's Opinion that bank credit card transactions are governed by the Retail Credit Sales Act, but rather whether the provision on the Retail Credit Sales Act excepting licensees under Chapter 367 from the definition of "retail seller" or "seller" also excepts plaintiffs from that definition by operation of Section 85 of Title 12. Thus it can be assumed that the Opinion of the Attorney General stating that the Retail Credit Sales Act is applicable to credit card transactions by institutions other than Chapter 367 licensees and national banks is correct and that a state bank engaging in the identical bank credit card operations as engaged in by plaintiffs herein may charge only that rate permitted by the Retail Credit Sales Act.

Section 85 of Title 12 permits national banks to charge the highest rate of interest *permitted* to competing lenders on similar loans, notes, or other evidences of debt by state law. Tiffany v. National Bank, *supra.* The State of Missouri has, by excepting small loan companies licensed under Chapter 367 from the provisions of the Retail Credit Sales Act, permitted those licensees to charge the rate of interest allowed by the Small Loan Act on credit transactions, loans, "retail time transactions" and "retail charge agreements" governed by the provisions of the Retail Credit Sales Act. From the teachings of Tiffany v. National Bank, *supra,* it clearly follows that plaintiffs as national banks are entitled to charge the rate of interest permitted to those Chapter 367 licensees on their credit transactions, loans, "retail time transactions" and "retail charge agreements."

It is irrelevant to a determination of the rate permitted to national banks under Section 85 of Title 12 that competing lenders, including Chapter 367 licensees, are not actually charging the highest rate permitted to them under State law. And, it is irrelevant that competing state lenders are not at the present time engaging in the same particular type or class of loan or credit transaction as national banks. The important determination is whether competing state licensed or chartered lenders *may* engage in the particular type or class of loan, and the rate of interest they *may* charge in connection therewith. Whether state chartered banks will enjoy parity of interest regulation with national banks on similar or identical loan or credit transactions is, under operation of Section 85 of Title 12, left to the state to decide by the enactment of legislation relating to the classification of lenders and interest rates permitted to those classes. See First National Bank v. Nowlin, *supra.* Assuming the correctness of the Attorney General's Opinion applying the Retail Credit Sales Act to transactions evidenced by plaintiffs' bank credit card operations, by excluding Chapter 367 licensees from the applicability of the Missouri Retail Credit Sales Act, Missouri has in effect made small loan companies licensed under that Chapter "favored lenders" in the class of debt encompassed by the Retail Credit Sales Act.[9] Plaintiffs, as

9. It is worthy to note that if the Opinion of the Attorney General is incorrect, and it is determined by Missouri Courts that persons granting credit to retail buyers for the purpose of purchasing goods and services pursuant to a retail charge agreement, although included in the definition of "seller" in the Retail Credit Sales Act, are not engaging in "retail time transactions" and "retail charge agreements" as defined by the Act, then pos-

national banks, are entitled to parity of interest charges with these lenders, notwithstanding the rates permitted to state chartered banks. To hold otherwise would be contrary to the congressional policy of assuring national banks parity with most favored state lenders and frustrate one of the primary objectives of the National Banking Act—competitive state-federal equality.

For the reasons stated, the Court concludes that on debts incurred under their bank credit card operations plaintiffs may charge the rates of interest authorized by the Missouri Small Loan Act, and are not limited in those charges by the "time charge" provisions of the Missouri Retail Credit Sales Act. See Tiffany v. National Bank, *supra*; Northway Lanes v. Hackley National Bank & Trust Co., 464 F.2d 855 (6th Cir. 1972); see also Partain v. First National Bank of Montgomery, 336 F.Supp. 65 (M.D. Ala.1971), reversed on other grounds, 467 F.2d 167 (5th Cir. 1972); First National Bank v. Nowlin, *supra;* Acker v. Provident National Bank, *supra*; Haas v. Pittsburgh Nat. Bank, *supra.*

*The Propriety of Quo Warranto Proceedings*

It is apparent that the basis of the *quo warranto* proceedings which the defendant has threatened to bring against plaintiffs is the penalty provisions of the Missouri Retail Credit Sales Act, specifically Section 408.370 RSMo., which provides as follows:

"Any person (individual, partnership, corporation, or association) who shall knowingly violate any provisions of sections 408.250 to 408.370 shall be deemed guilty of a misdemeanor and upon conviction shall be punished by a fine of not more than five-hundred dollars or by imprisonment for not more than six months or both."

Because the presence of a national bank in a state is attributable to the power of the federal government and not the state's permission, a state may only under certain circumstances enforce its laws against national banks through *quo warranto* proceedings. First National Bank v. Missouri, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486 (1923). See McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579 (1819). Under these limited circumstances the *quo warranto* proceedings do not seek to oust the national bank from its national charter or determine that it is acting in excess of its national charter powers, and it does not seek to forfeit the national bank's state corporate franchise or prevent it from doing business in the state. Rather, the state *quo warranto* proceeding seeks to prohibit the national bank from committing particular acts allegedly made illegal by state law. State ex rel. Barrett v. First National Bank of St. Louis, 297 Mo. 397, 249 S.W. 619 (en banc 1923), affirmed, First National Bank v. Missouri, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486 (1923).

It is fundamental that national banks are instrumentalities of the Federal Government and subject to the paramount authority of the United States. McCulloch v. Maryland, *supra.* As such, they are subject to the states' laws only to the extent that those laws do not interfere with the purposes of the national banks creation or tend to impair or destroy their efficiency, or conflict with the paramount laws of the United States. Davis v. Elmira Savings Bank, 161 U.S. 275, 16 S.Ct. 502, 40 L.Ed. 700 (1896); First National Bank v. Missouri, *supra.* The states can exer-

sibly Chapter 367 licensees would not be considered "favored lenders" when compared to lenders not actually regularly selling retail goods or services to buyers. Such a determination would not, obviously, subject plaintiffs' bank credit card operations to the "time charge" limits of the Retail Credit Sales Act, but could possibly bear on the validity of the exemption of Chapter 367 licensees under Article 3, § 44 of the Missouri Constitution. See Household Finance Corp. v. Shaffner, 356 Mo. 808, 203 S.W.2d 734 (1947).

cise no control over national banks or otherwise affect their operation except as Congress permits. Farmers and Merchants National Bank v. Dearing, 91 U.S. 29, 23 L.Ed. 196 (1875); Osborn v. Bank of United States, 9 Wheat. 738, 6 L.Ed. 204 (1824). For these reasons, the power of Congress to establish national banks and exempt them from state penalties for usury cannot be questioned. See First National Bank v. Nowlin, *supra*. And, Congress having established the penalty for usury by national banks, that action preempts the field and constitutes the exclusive remedy for a national banks' violation of the usury provisions of Title 12, Section 85, 12 U.S.C. § 86; Evans v. National Bank, supra; First National Bank v. Nowlin, *supra;* see Farmers & Merchant's Nat. Bank v. Dearing, *supra;* see also McCollum v. Hamilton National Bank, 303 U.S. 245, 58 S.Ct. 568, 82 L.Ed. 819 (1938).

As state penalties for usury are not enforceable against national banks either by private parties or by the state itself, it clearly follows that the state of Missouri cannot enforce the penalty provisions of the Missouri Retail Credit Sales Act against the plaintiffs herein either by state legislation or by a proceeding in the state court in the nature of *quo warranto*. See Easton v. Iowa, 188 U.S. 220, 23 S.Ct. 288, 47 L.Ed. 452 (1902); First National Bank v. Missouri, *supra*. Undoubtedly, the State of Missouri has the legitimate power to define and punish illegal acts by persons within its jurisdiction. However, this power does not extend to national banks organized and operating within the state under the laws of the United States when the acts deemed in violation of state law are governed by federal statute. Easton v. Iowa, *supra;* see First National Bank v. Missouri, *supra*, 263 U.S. at 662–667, 44 S.Ct. 213, dissenting opinion; State ex rel. Barrett v. First National Bank of St. Louis, *supra*, at 623.

In view of the long-established principles outlined above, it is clear that the State of Missouri through its Attorney General would by the institution of the threatened *quo warranto* proceedings be appropriating the function of enforcing federal statutes relating to usury by national banks, a function which Congress has prohibited the states from exercising. Missouri statutes providing penalties for usury are not applicable to these plaintiffs as national banks, and they cannot be applied to these plaintiffs either directly or by a proceeding in the nature of *quo warranto*. The law as stated in Davis v. Elmira Savings Bank, 161 U.S. 275, 16 S.Ct. 502, 40 L.Ed. 700 (1896) by Mr. Justice White applies equally to the threatened action of the defendant herein. That is:

> "National banks are instrumentalities of the federal government, created for public purpose, and as such necessarily subject to the paramount authority of the United States. It follows that an attempt by a state to define their duties or control the conduct of their affairs is absolutely void, wherever such attempted exercise of authority expressly conflicts with the laws of the United States, and either frustrates the purpose of the national legislation or impairs the efficiency of these agencies of the federal government to discharge the duties for the performance of which they were created." 161 U.S. at 283, 16 S.Ct. at 503.

The *quo warranto* proceedings threatened by the Attorney General would clearly conflict with the laws of the United States as codified in 12 U.S.C. §§ 85 and 86, and would jeopardize the national banking system which assures national banks parity with favored state lenders and which prohibits the states from setting penalties for violations of federal law. Therefore, for the reasons stated, those threatened *quo warranto* proceedings cannot be maintained.

Accordingly, for the reasons stated, the Court finds and declares that plain-

tiffs, as national banking associations, are entitled under Section 85 of Title 12, United States Code, to charge interest on their bank credit card operations at the rates permitted by the Missouri Small Loan Act. The Court further finds and declares that the provisions of the Missouri Retail Credit Sales Act relating to permitted interest or finance charges are inapplicable to plaintiffs to the same extent that they are by state law inapplicable to Chapter 367 licensees in Missouri.

The Court does not deem it necessary to enjoin the Attorney General for the State of Missouri from the institution of the threatened *quo warranto* proceedings at this time, as it is anticipated that the Attorney General will in view of the Court's opinion refrain from the institution of those proceedings against plaintiffs. Should the parties deem an injunction necessary, appropriate application may be made to the Court.

Costs of the suit are taxed against defendant.

It is so ordered.