Fred FISHER, on Behalf of Himself and on Behalf of All Other Persons Similarly Situated, Appellant,

v.

FIRST NATIONAL BANK OF OMAHA, Omaha, Nebraska, Appellee.

No. 75–1976.

United States Court of Appeals, Eighth Circuit.

Submitted June 16, 1976.

Decided Jan. 28, 1977.

Everett Meeker (argued), Washington, Iowa, Lex Hawkins and Glenn L. Norris, Des Moines, Iowa, and Patrick L. Cooney, Omaha, Neb., on brief, for appellant.

William E. Morrow, Jr. (argued), and Donald J. Buresh, Omaha, Neb., on brief, for appellee.

Before GIBSON, Chief Judge, and LAY and HENLEY, Circuit Judges.

HENLEY, Circuit Judge.

Plaintiff challenges in this appeal the method by which defendant First National Bank of Omaha computed the service charge on its customers' BankAmericard re-

volving charge accounts. Plaintiff brings this appeal from the district court's [1] grant of summary judgment denying injunctive relief and damages on his claims of usury in violation of the National Bank Act, 12 U.S.C. §§ 21 *et seq.* and price-fixing in violation of the Sherman Anti-trust Act, 15 U.S.C. § 1 et seq. Plaintiff also appeals from denial of his motion for a class determination under Fed.R.Civ.P. 23.

# I

Defendant First National Bank of Omaha is a national banking association with its principal place of business in Omaha, Nebraska. As a Class A member of National BankAmericard Incorporated, defendant is licensed to operate the BankAmericard franchise credit card system in Nebraska and Iowa. The sole named plaintiff, Fred Fisher, is a resident of the State of Iowa. Fisher received an unsolicited BankAmericard from defendant sometime in February, 1969 when cards were mailed to preferred customers selected from lists supplied by correspondent banks.[2] He used his card from time to time to make credit purchases from member merchants in Iowa and, on one occasion, his wife obtained a $250.00 cash advance from the Coralville Bank & Trust Company in Coralville, Iowa. At all times material to this case, the interest defendant charged on cash advance and sales drafts was computed at a rate of 1½% per month (18% per annum) on the previous month's unpaid balance up to $499.99, and 1% per month (12% per annum) on previous balances of $500.00 or more. There is also a fixed service fee on cash advances of $1.00 for each $50.00 of cash advanced. No interest is charged, however, if the previous month's balance is paid in full within twenty-five days of the billing date.

Plaintiff commenced this litigation by filing two class actions in the Southern District of Iowa. In one complaint he alleged violations of the federal Truth In Lending Act, 15 U.S.C. §§ 1601 *et seq.,* and in the other he alleged usury in violation of the National Bank Act, 12 U.S.C. §§ 85 and 86. In each case the defendant moved to dismiss the complaints on account of improper venue.[3] The district court in Iowa found that venue was improperly laid in that district and transferred the cases to the District of Nebraska as authorized by 28 U.S.C. § 1406(a). *Fisher v. First Nat'l Bank of Omaha,* 338 F.Supp. 525 (S.D.Iowa 1972).[4] After the transfer the complaints were amended and the cases were consolidated. Count I of the amended complaint alleged Truth In Lending violations; Count II alleged usury; Count III set out alleged antitrust violations; and Counts IV and V undertook to allege civil rights violations. Plaintiff moved for a determination that the actions be maintained as a class action; that motion was denied by the district court on the ground that the case failed to satisfy the requirements of Rule 23(b)(3). The district court certified the case as a proper one for an interlocutory appeal under 28 U.S.C. § 1292(b), but the necessary permission for such an appeal was denied by this court on January 15, 1974.

Upon cross-motions for summary judgment, the district court granted summary judgment in favor of plaintiffs on the Truth In Lending violations asserted in Count I and awarded attorney's fees and costs, but granted summary judgment for defendant on the remaining four counts. In an unreported memorandum opinion

---

1. The Honorable Robert V. Denney, United States District Judge for the District of Nebraska.

2. Correspondent banks accept cash advance drafts for defendant and forward to defendant sales drafts deposited by member merchants. Drafts are not charged to the cardholder's account until they are accepted by defendant in Omaha.

3. Under 12 U.S.C. § 94, venue lies in the district where a national bank is located and established.

4. Plaintiffs' appeal from the transfer order was dismissed by this court on the ground that the district court's order was a nonappealable interlocutory order. *See Fischer v. First Nat'l Bank of Omaha,* 466 F.2d 511 (8th Cir. 1972).

filed June 24, 1975, the district court held that the interest rate which defendant may legally charge on credit card loans is governed by the usury laws of the state where the extension of credit occurs; that in this case credit was extended at Omaha, Nebraska where the drafts are received and charged to the cardholder's account; and that the interest charged by defendant on its BankAmericard plan was not usurious in Nebraska. The court also found that plaintiff's remaining claims (antitrust and civil rights) were without merit.

On this appeal plaintiff does not complain of the action of the district court in dismissing the civil rights counts of the amended complaint. He does complain of the ruling of the district court on the usury and antitrust claims and of the action of the district court in refusing to permit the case to be prosecuted as a class action.

The defendant has not cross-appealed from the ruling of the district court on plaintiff's Truth In Lending claim.

## II

■ In this section of this opinion and in the succeeding one we will deal with the usury issue.

The rate of interest that a national bank may charge is ultimately a question of federal law, and the matter is governed by 12 U.S.C. § 85 which in pertinent part is as follows:

> Any association [national bank] may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bill of exchange, or other evidences of debt, interest at the rate allowed by the laws of State, Territory, or District where the bank is located . . . and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under this chapter.

Neither side questions the proposition that the relevant law in this case is that of Nebraska as far as credit card transactions that originated in Nebraska are concerned. The question is whether under the National Bank Act we are required to apply the law of Nebraska or the law of Iowa to transactions which were initiated in Iowa but consummated in Nebraska.

The district court found in effect that when a holder of a BankAmericard uses his card in Iowa to make a retail purchase or to obtain a cash advance, he creates a three party draft which operates functionally as though he had drawn a check on the defendant bank in Omaha, Nebraska. And the district court then stated:

> A customer using this "lender credit card" . . . communicates or indicates his intention to establish the credit card arrangement with BankAmericard when the lender, through banking channels, receives in the State of Nebraska the draft of the customer.

> This determination hereby renders the plaintiff's allegation that the defendant is engaged in making usurious loans in Iowa moot. The interest rate-finance charge extracted by BankAmericard from its customers is clearly a lawful rate within the State of Nebraska. Neb.Rev. Stat. Section 45–137 (1943).

Although the transactions with which we are concerned were and are interstate in nature, we do not necessarily quarrel with the view of the district court that the credit arrangements involved are consummated in Nebraska, and that credit to the cardholders is extended in that state, and that Nebraska law should be applied on that basis. *See Schumacher v. Lawrence,* 108 F.2d 576 (6th Cir. 1940), and *Haas v. Pittsburgh Nat'l Bank,* 60 F.R.D. 604, 608, n. 3 (W.D. Pa.1973). We are persuaded, however, that it really makes no difference whether the transactions are characterized as being Nebraska transactions or whether they are characterized as Iowa transactions.

In the very recent case of *Fisher v. First Nat'l Bank of Chicago,* 538 F.2d 1284 (7th Cir. 1976), it was held that under the provisions of § 85, if a national bank in one state makes a loan in another state in which it is doing business, and if there is a differential

between the maximum rate allowable in one state and the maximum rate allowable in the other state with respect to the same class of debt, the bank may charge the higher of the two rates.

We find ourselves in agreement with that holding. And when it is applied to this case, it is clear that the bank is entitled to charge on these transactions the highest permissible Nebraska rate for the same class of loan regardless of whether the loan is made in Nebraska or Iowa since the maximum rate allowable in Iowa is no higher than the maximum rate allowable in Nebraska. If Iowa permitted a higher rate, which it does not, the bank would be entitled to charge the higher rate.

### III

Plaintiff's account with BankAmericard ran from April, 1969 through March, 1971. The case was decided by the district court on June 26, 1975. During that overall period of time Nebraska recognized a number of categories of loans and differentiated between them as far as permissible rates of interest were concerned.

The maximum rate of interest allowed for ordinary loans was 9% per annum simple interest, a rate that was raised to 11% per annum effective August 24, 1975. Laws 1975, LB 349, § 2, R.S.Neb. § 45–103.-03 (1976 Cum.Supp.).

Nebraska also allowed licensed lenders to make personal installment loans up to $3,000.00, and to charge the following interest rates: 30% per annum on loans with respect to which the unpaid balance was less than $300.00; 24% on loans having unpaid balances of between $300.00 and $500.00; 18% on loans having unpaid balances of between $500.00 and $1,000.00; and 12% on loans having unpaid balances in excess of $1,000.00. R.S.Neb. §§ 45–114 et seq., particularly § 45–137.

Additional recognized categories of credit transactions other than bank loans were revolving charge agreements, R.S.Neb. §§ 45–201 et seq., and installment sales contracts, R.S.Neb. §§ 45–301 et seq.

Nebraska state banks were, and are, permitted to make personal loans repayable in installments. R.S.Neb. §§ 8–815 et seq. However, a Nebraska bank was not, and is not, permitted to obtain a license to make installment loans authorized by §§ 45–114 et seq., and was and is prohibited from making such loans. R.S.Neb. § 8–817. The maximum interest permitted with respect to a bank installment loan was 18% per annum simple interest on the first $1,000.00 and 12% per annum on a balance of more than $1,000.00; and banks were permitted to charge in lieu of interest a flat fee of $5.00 on "small loans." R.S.Neb. § 8–820.

In 1975 the Nebraska Legislature adopted an act which became effective on January 1, 1976. Section 1 of that statute provided that as far as interest rates were concerned credit extensions initiated by bank credit card transactions would be governed by the general statutes dealing with personal loans made by banks including § 8–820, which has been mentioned. Laws 1975, LB 269, § 1, R.S.Neb. § 8–101(8) (Cum.Supp.1976).

It is clear to us that prior to January 1, 1976, a bank credit card transaction was most closely analogous to an ordinary bank installment loan, the interest rate for which was prescribed by § 8–820, and we are satisfied that before the date just mentioned the Supreme Court of Nebraska would have held in the case of a state bank that the maximum interest that could be charged on a credit card transaction was as prescribed by § 8–820.

The balance of plaintiff's account with the defendant never approached $1,000.00, and for a number of months it was less than $500.00. Ostensibly the 18% rate charged by the defendant would not have been prohibited by § 8–820. However, there was a dispute between the parties as to how interest on plaintiff's account should be computed under § 8–820, and the problem was complicated by the $5.00 flat charge that had been made by the defendant with respect to the single transaction in which plaintiff's wife obtained a cash advance of $250.00, which charge the plaintiff claimed was prohibited by § 8–821.

The district court did not find it necessary to resolve that dispute because it was of the opinion that notwithstanding the limitations imposed on state banks by Nebraska law, a national bank may legally charge with respect to credit card transactions the rates allowed to "small loan companies" under §§ 45–114 et seq. And the district court held that when measured by those rates, the transactions in question were not usurious.

In support of its holding the district court cited *Northway Lanes v. Hackley Union Bank & Trust Co.*, 464 F.2d 855 (6th Cir. 1972), and *Union Missouri Bank of Kansas City, N. A. v. Danforth, Attorney General*, 394 F.Supp. 774 (W.D.Mo.1975).

In *Northway Lanes, supra*, 464 F.2d at 861–64, a case involving a Michigan national bank, the court held that since a savings and loan association in Michigan was permitted to charge to the borrower in addition to interest the closing costs of a real estate loan, a national bank could legally make such an additional charge even though a state bank would not have been permitted to do so.

In *Danforth, supra*, Judge Hunter held that national banks in Missouri are entitled to charge with respect to credit card transactions the rates permitted to small loan companies in Missouri as against the contention of the Attorney General that the transactions involved were installment sales of goods and services and that the maximum authorized rates were the somewhat lower rates prescribed by the Missouri Retail Credit Sales Act of 1961. The district court was of the opinion that regardless of whether the transactions were considered "sales" or whether they were considered "loans" under Missouri law, they resulted in "debts" of the same type that resulted when licensed small loan brokers made loans of money to borrowers with the latter using the proceeds of the loan to pay for goods or services. And the district court concluded that under the "most favored lender" doctrine to be mentioned, Missouri national banks could legally charge the small loan rates even though Missouri small loan companies were not banks and even though the loans made by them did not involve the use of credit cards. Appeal in *Danforth* was not prosecuted to decision on the merits.

12 U.S.C. § 85 was designed by Congress to place national banks on a plane of at least competitive equality with other lenders in the respective states, and, indeed, to give to national banks a possible advantage over state banks in the field of interest rates. Thus, a national bank is not limited to the interest rate that a state bank may charge with respect to a particular type of loan if another lender in the state is permitted to charge a higher rate of interest on the same type of loan. In that situation the national bank may charge the higher rate. This "most favored lender" doctrine was recognized by the Supreme Court in *Tiffany v. National Bank of Missouri*, 18 Wall. (85 U.S.) 409, 21 L.Ed. 862 (1873), and it was discussed and applied by this court in *First Nat'l Bank in Mena v. Nowlin*, 509 F.2d 872 (8th Cir. 1975).[5] The doctrine was also applied in *Fisher v. First Nat'l Bank of Chicago, supra*, and in *Northway Lanes v. Hackley Union Bank & Trust Co., supra*.

As pointed out in *Northway Lanes, supra*, 464 F.2d at 864, the Comptroller of the Currency has considered for many years that § 85 incorporates the "most favored lender" doctrine, and that national banks may charge the maximum rate permitted by state law to any competing state char-

---

5. The problem of "competitive equality" between national banks and state banks in the field of branch banking has been before this court recently in three cases. *Nebraskans for Independent Banking v. Omaha Nat'l Bank*, 8 Cir., 530 F.2d 755 (1976), *vacated and remanded for further consideration in light of supervening Nebraska legislation*, 426 U.S. 310, 96 S.Ct. 2616, 48 L.Ed.2d 658 (1976); *Missouri ex rel. Kostman v. First Nat'l Bank in St. Louis*, 538 F.2d 219 (8th Cir. 1976); *St. Louis County Nat'l Bank v. Mercantile Trust Co., N. A.*, 548 F.2d 716 (8th Cir. 1976). And the members of the court have not been in entire agreement with respect to the problem. See the concurring opinion of Judge Lay and the dissenting opinion of Judge Webster in which the writer joined in *Nebraskans for Independent Banking, supra; see also* the writer's dissent in *Mercantile Trust, supra*.

tered or licensed lending institution, including institutions licensed by state law to make "small loans." In that connection 12 C.F.R. § 7.7310 provides:

(a) A national bank may charge interest at the maximum rate permitted by State law to any competing State-chartered or licensed lending institution. If State law permits a higher interest rate on a specified class of loans, a national bank making such loans at such higher rate is subject only to the provisions of State law relating to such class of loans that are material to the determination of the interest rate. For example, a national bank may lawfully charge the highest rate permitted to be charged by a State-licensed small loan company or morris plan bank, without being so licensed.

(b) A national bank located in a State the law of which denies the defense of usury to a corporate borrower may charge a corporate borrower any rate of interest agreed upon by such borrower.

It is quite true that lenders licensed in Nebraska under the provisions of R.S.Neb. §§ 45–114 *et seq.* are not engaged in competition with banks in the over-all business of banking and that the loans made by them do not involve credit card transactions. That, however, is not of controlling importance.

While a licensed maker of small loans in Nebraska and a state or national bank in Nebraska are lenders of different types, and while small loans companies doubtless make loans that banks would not make, there is really no essential difference between the type of consumer loan that is made by a small loan company and the type of consumer loan that is made by the defendant bank on the basis of a credit card transaction. Whether the loan is made by a small loan company or whether it is made by a bank, it is a consumer loan which may be repaid in installments. In other words, if a person desires to buy merchandise worth $100.00 on installment credit, it makes no practical difference whether he gets the money from a small loan company and pays cash for the merchandise or whether he obtains the merchandise in the first instance by using a credit card and ultimately discharges the obligation by installment payments to the bank.

The situation existing in Nebraska does not differ in essence from that which prevailed in Missouri when *Danforth, supra,* was decided. In that case the district court in comparing the loans made by licensed small lenders and credit card loans made by the banks involved in that case said (394 F.Supp. at 783):

The stipulations and evidence in this cause establishes that Small Loan Companies licensed under Chapter 367 RSMo. do compete with plaintiffs in the field of consumer credit, in that those licensees make loans of money to retail buyers for the purpose of purchasing goods and services. Although there is no evidence that these competing lenders are engaging in the particular method of extending credit as is evidenced by plaintiffs' bank credit card operations, it is clear that the consumer credit loans made by Chapter 367 licensees are similar to plaintiffs' extensions of credit through bank credit cards. In both instances, the borrower or buyer incurs a debt for the purpose of purchasing retail goods or services and defers payment over a period of time. Consumer credit loans by Chapter 367 licensees may, like plaintiffs' extension of credit under their bank credit cards, be unsecured. Section 367.100 RSMo. (1969).

And a little further in its opinion the district court also said (394 F.Supp. at 784–85):

It is irrelevant to a determination of the rate permitted to national banks under Section 85 of Title 12 that competing lenders, including Chapter 367 licensees, are not actually charging the highest rate permitted to them under State law. And, it is irrelevant that competing state lenders are not at the present time engaging in the same particular type or class of loan or credit transaction as national banks. The important determination is whether competing state licensed or chartered lenders *may* engage in the

particular type or class of loan, and the rate of interest they *may* charge in connection therewith. Whether state chartered banks will enjoy parity of interest regulation with national banks on similar or identical loan or credit transactions is, under operation of Section 85 of Title 12, left to the state to decide by the enactment of legislation relating to the classification of lenders and interest rates permitted to those classes. See *First National Bank v. Nowlin, supra.* Assuming the correctness of the Attorney General's Opinion applying the Retail Credit Sales Act to transactions evidenced by plaintiffs' bank credit card operations, by excluding Chapter 367 licensees from the applicability of the Missouri Retail Credit Sales Act, Missouri has in effect made small loan companies licensed under that Chapter "favored lenders" in the class of debt encompassed by the Retail Credit Sales Act. [Footnote omitted.] Plaintiffs, as national banks, are entitled to parity of interest charges with these lenders, notwithstanding the rates permitted to state chartered banks. To hold otherwise would be contrary to the congressional policy of assuring national banks parity with most favored state lenders and frustrate one of the primary objectives of the National Banking Act— competitive state-federal equality.

In view of what has been said, we find ourselves in agreement with the district court that the defendant bank was entitled to charge the rates of interest permitted to Nebraska licensees under R.S. §§ 45–114 *et seq.*, and that the dealings between the plaintiff and the defendant were not in any event tainted with usury.

### IV

Plaintiff's antitrust claim is based in large measure on his contention, which we have rejected, that the defendant was charging usury, and that it had conspired with other banks and with merchants to exact usury in connection with interstate transactions.

Apart from any question of usury, we agree with the district court that there is no substance to the antitrust claim.

On a national basis, the BankAmericard system of bank credit cards is controlled ultimately by a corporation known as National BankAmericard, Inc. (NBI). The only other nationwide bank credit card system that operates today is the Master Charge system that is controlled by Interbank Charge Association (Interbank).

In 1971 NBI had a by-law which prohibited a bank which was a Class A member of NBI from becoming a fully participating member of the Interbank organization. In that year Worthen Bank & Trust Company of Little Rock, Arkansas filed an antitrust suit against NBI attacking the by-law that has been mentioned. It was claimed that the by-law was a "horizontal restraint of trade" prohibited by § 1 of the Sherman Anti-trust Act, 15 U.S.C. § 1.

The case was considered by Senior District Judge John E. Miller, and in July, 1972 he found that the challenged by-law was a per se violation of the Sherman Act and granted a partial summary judgment in favor of the plaintiff. *Worthen Bank & Trust Co. v. Nat'l BankAmericard, Inc.*, 345 F.Supp. 1309 (E.D.Ark.1972). NBI appealed to this court, and the judgment of the district court was reversed, the view being taken that the claim of the plaintiff involved questions of fact, and that a trial would be necessary. *Worthen Bank & Trust Co. v. Nat'l BankAmericard, Inc.*, 485 F.2d 119 (8th Cir. 1973), *cert. denied*, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974).[6]

In the course of his opinion Judge Miller described the BankAmericard system as follows (345 F.Supp. at 1318):

. . . There is competition in the bank credit card business between the individual member banks of the systems on the merchant and cardholder level and between the systems themselves in association of member banks. There are no territorial limits or exclusive dealers

---

**6.** The case was never tried on the merits following the remand from the court of appeals.

within the bank credit card business. NBI can best be described as a joint venture among member banks which produces an identifiable product, BankAmericard. BankAmericard can only function through its member banks and the card could not operate without a central organizational unit, NBI, or member banks, Worthen. . . .

In the Worthen-NBI litigation there was no suggestion that apart from the by-law of NBI which was in controversy the activities of NBI, its member banks, or participating merchants constituted any violation of the antitrust laws, and in the instant case we are satisfied that the operations that have been described are not violative of the Sherman Act.

Banks which participate in the NBI program are not precluded from participating in the Master Charge program; merchants who have signed up with BankAmericard may also honor Master Charge cards or other credit cards. Consumers who hold BankAmericards may also hold and use other credit cards, such as Master Charge, American Express or Diners Club. A consumer who holds a BankAmericard is not required to use his card when he makes a purchase; he may pay cash, or the merchant may extend him credit without regard to the card.

In 1972 Judge Miller noted the phenomenal growth of the bank credit card business in this country (345 F.Supp. at 1318). The growth has continued. It is clear to us that a consumer credit system like that of BankAmericard promotes and facilitates, rather than restrains, interstate trade and commerce. And, indeed, in the absence of such a system the scope of consumer credit transactions in both interstate and intrastate commerce would be severely restricted. As Judge Miller also observed, if such a system is to work it has to have a central organization and participating banks, and it also has to have participating merchants.

V

■ As to the class action feature of the case, we are of the opinion that the district court did not err or abuse its discretion in refusing to permit the Truth In Lending Claim to be prosecuted as a class action under Rule 23(b)(3). *See Wilcox v. Commerce Bank of Kansas City*, 474 F.2d 336 (6th Cir. 1973); *Ratner v. Chemical Bank New York Trust Co.*, 54 F.R.D. 412 (S.D.N.Y.1972).

As an abstract proposition, the claim based on usury and on alleged antitrust violations may have stood on a somewhat different footing. *See Wilcox v. Commerce Bank of Kansas City, supra*, 474 F.2d at 346, and *Partain v. First Nat'l Bank of Montgomery*, 59 F.R.D. 56 (M.D.Ala.1973).

However, since we have concluded that both of those claims are without merit, no useful purpose would have been served by permitting plaintiff to maintain his suit as a class action.

The judgment of the district court is affirmed.