ATTORNEY GENERAL OF MARYLAND ET AL. *v.*
THE EQUITABLE TRUST COMPANY ET AL.

[No. 128, September Term, 1981.]

*Decided October 6, 1982.*

The cause was argued before MURPHY, C. J., and ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ., and CHARLES E. ORTH, JR., Associate Judge of the Court of Appeals (retired) and CHARLES AWDRY THOMPSON, Associate Judge of the Court of Special Appeals, specially assigned.

*Eleanor M. Carey* and *Paul F. Strain, Deputy Attorneys General,* with whom were *H. Robert Erwin* and *Robert deV.*

*Frierson, Assistant Attorneys General,* on the brief, for appellants/cross appellees.

*Judith D. O'Neill,* with whom were *Stanford D. Hess, Judith C. Levinson* and *Weinberg & Green* on the brief, for appellees/cross appellants.

RODOWSKY, J., delivered the opinion of the Court.

This case involves the interplay between (1) the National Bank Act's "most favored lender" doctrine, (2) the Maryland Consumer Loan Law (MCLL), Md. Code (1975, 1982 Cum. Supp.), §§ 12-301 *et seq.* of the Commercial Law Article (CL) and (3) the Retail Credit Accounts Law (RCAL), Md. Code (1975, 1982 Cum. Supp.), CL §§ 12-501 *et seq.* The context of the controversy is (1) bank financing of purchases, made by the holders of bank issued credit cards, from retail merchants that participate in the credit card plan, and (2) unsecured cash advances made to those credit cardholders by or for the card issuing bank. Federally chartered banks and federally insured, state chartered banks brought this action seeking a declaratory judgment. The basic issues before this Court are:

> 1. Do the plaintiff banks have a right, conferred by federal law, to utilize the rates of interest provided by MCLL when assessing finance charges on outstanding balances that represent purchases of goods and services by holders of credit cards issued by the banks; and
>
> 2. In utilizing MCLL rates of interest, either when financing credit card purchases, or when making cash advances, must the plaintiff banks comply with any provisions of MCLL other than provisions fixing the maximum rate of interest and the maximum loan amount?

The trial court decreed that the banks could apply MCLL rates to credit card purchase balances. As to the second issue, the trial court held that a number of additional MCLL

provisions must be complied with in order for the banks to utilize MCLL rates in their sales and loan credit plans. Both sides appealed. Certiorari was issued by this Court prior to consideration of the cross-appeals by the Court of Special Appeals. For reasons hereinafter stated, we shall reverse the judgment of the trial court on the first issue and shall affirm in part, reverse in part, and vacate in part on the second issue.

First National Bank of Maryland and Maryland National Bank, which are national banking associations, and The Equitable Trust Company, Provident Savings Bank of Baltimore, The Savings Bank of Baltimore and Suburban Trust Company, which are state chartered banks, were plaintiffs below (Plaintiffs, or, the Banks). Each of the state Banks is insured under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811 et seq., as amended by § 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDA), 94 Stat. 132, 164, 12 U.S.C. § 1831d. Defendants below were the Attorney General of Maryland, the Commissioner of Consumer Credit and the Deputy Bank Commissioner (the State).

As initially held in *Tiffany v. National Bank,* 85 U.S. (18 Wall.) 409, 21 L. Ed. 862 (1874), § 30 of the National Bank Act of 1864, 13 Stat. 99, 108, which, as amended, is now 12 U.S.C. § 85, confers on national banks the same status as to permissible interest rates as is enjoyed by the "most favored lender" under applicable state law.[1] In *Marquette National*

---

1. 12 U.S.C. § 85 provides in relevant part:

§ 85. Rate of interest on loans, discounts and purchases

Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under this chapter. When no rate is fixed by the laws of the State, or Territory, or District, the bank

*Bank v. First of Omaha Service Corp.,* 439 U.S. 299, 314 n.26, 99 S. Ct. 540, 548 n.26, 58 L. Ed. 2d 534, 545 n.26 (1978), the Supreme Court stated that the " 'most favored lender' status for national banks under *Tiffany* has since been incorporated into" an interpretive ruling of the Comptroller of the Currency found at 12 CFR § 7.7310 (a). It reads:

> § 7.7310 Charging interest at rates permitted competing institutions; charging interest to corporate borrowers.
>
> (a) A national bank may charge interest at the maximum rate permitted by State law to any competing State-chartered or licensed lending institution. If State law permits a higher interest rate *on a specified class of loans,* a national bank making *such loans* at such higher rate is subject only to the *provisions of State law relating to such class of loans that are material to the determination of the interest rate.* For example, a national bank may lawfully charge the highest rate permitted to be charged by a State-licensed small loan company or morris plan bank, without being so licensed. [Emphasis added.]

The first issue in this case essentially involves what constitutes a "specified class of loans" and the second issue is concerned with which provisions of MCLL are "material to the determination of the interest rate" relating to a specified class of loans. As the case comes to us, the answers to the issues framed will be the same for all Plaintiffs. The trial

---

may take, receive, reserve, or charge a rate not exceeding 7 per centum, or 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and such interest may be taken in advance, reckoning the days for which the note, bill, or other evidence of debt has to run. . . . And the purchase, discount, or sale of a bona fide bill of exchange, payable at another place than the place of such purchase, discount, or sale, at not more than the current rate of exchange for sight drafts in addition to the interest, shall not be considered as taking or receiving a greater rate of interest.

court declared that the state chartered Plaintiffs enjoy the most favored lender doctrine, pursuant to DIDA, to the same extent as national banks. This holding by the trial court is not challenged by the State on this appeal.[2]

MCLL rates may be applied by national banks to certain unsecured cash advances effected by use of their credit cards as a consequence of the holding in *Commissioner of Small Loans v. First National Bank,* 268 Md. 305, 300 A.2d 685 (1973). There we affirmed a declaratory judgment that 12 U.S.C. § 85 constituted authority for national banks located in Maryland to charge interest on credit card loans of the amount dealt with in the Maryland Small Loan Act at the same rates of interest permitted to be charged by lenders licensed under that act. By Ch. 693 of the Acts of 1977 the Small Loan Act was repealed and its subject matter consolidated into MCLL. *Commissioner* did not involve whether small loan rates could be applied in the financing of credit card purchases, or reach the question of how much of the Small Loan Act applied to national banks that would utilize small loan rates on cash advances.

## I

Do the Banks have the right under the most favored lender doctrine to use MCLL rates for sales transactions? In the terminology of 12 CFR § 7.7310 the inquiry is whether third party financing of purchases under an open end credit plan is a loan of the same class as the making of a cash advance under MCLL. To understand the issue requires a partial survey of the different types of credit extensions under Maryland law classifications.

Md. Code (1975, 1982 Cum. Supp.), Title 12, "Credit Regulations," of the Commercial Law Article contains the relevant state law statutory provisions.[3] Subtitle 1 is the

---

**2.** The argument for this result may be found in Arnold and Rohner, *The "Most Favored Lender" Doctrine for Federally Insured Financial Institutions — What Are Its Boundaries?,* 31 Cath. U.L. Rev. 1, 1-12 (1981).

**3.** Unless otherwise expressly indicated, references to a section of Maryland statutory law will be a reference to a section of Title 12 of the Commercial Law Article, with the prefix "12-" omitted.

general interest and usury act. Except as otherwise provided by law, interest may not be charged in excess of an effective simple rate of 6% per annum on the unpaid principal balance of a loan. § 102. By written agreement signed by the borrower, 8% may be charged. § 103 (a) (1). Under the circumstances described in § 103 (b), there is no statutory ceiling on interest on loans secured by a first mortgage on residential real property. Interest not in excess of 24% is permissible if the loan is unsecured, or secured "by the pledge of collateral which is other than a savings account . . . ." § 103 (a) (3).[4] Credit card cash advances made by the Banks "located" in Maryland apparently operate at the present time under the last-cited provision.[5]

Subtitle 5, RCAL, applies to both two party and three party open end credit and to two party, closed end, unsecured credit.[6] RCAL is limited to the financing of purchases of goods and services. See § 501 (c), (d), (f), (h), (l), (m) and (n).[7]

---

**4.** This represents an increase from 18% effected by Ch. 753 of the Acts of 1982. It applies to "a loan made on or after July 1, 1982, and before July 1, 1985."

**5.** See Marquette National Bank v. First of Omaha Service Corp., supra, for the exportation by a national bank of the rate of interest permitted by the law of the state in which the bank is "located" into another state.

**6.** A "two party" plan means one under which the seller maintains the retail credit account of the buyer. A "three party" plan involves a buyer, a seller and a "financial institution" which is defined in § 501 (g) (1) to be "a person who enters into an agreement with a buyer by which the person agrees to extend credit to the buyer and apply it as directed by him by use of a credit card which the person issues to the buyer." A financial institution "includes an incorporated bank, savings institution, and trust company." § 501 (g) (2).

**7.** These provisions in relevant part read:

§ 12-501. Definitions.

. . . .

(c) Buyer. — (1) "Buyer" means a person who, under a retail credit account transaction, buys goods or obtains services from a seller not principally for the purpose of resale;

(2) "Buyer" includes:

(i) A person who enters into a prior agreement with a financial institution by which the financial institution agrees to pay the debts of the buyer as they accrue at various retail sellers designated by the financial institution, in consideration of which the buyer pays to the financial institution the cash sale price and the finance charge; and

(ii) A prospective buyer.

The maximum rate of finance charge on an open end, retail credit account is 2% per month. § 506 (a) (3).[8] State chartered banks and national banks "located" in this State at the present time finance purchase transactions, effected

---

(d) *Cash sale price.* — (1) "Cash sale price" means the price for which the seller would sell or furnish to the buyer the goods or services which are the subject of a retail credit account if the sale were a sale for cash and not under the account.

(2) "Cash sale price" includes any taxes and charges for delivery, installation, servicing, repair, alteration, or any improvement which is supplied or rendered in connection with the sale.

. . . .

(f) *Finance charge.* — "Finance charge" means the amount, however expressed, in excess of the cash sale price which a seller or financial institution charges a buyer for the privilege of purchasing goods or services in a retail credit account transaction.

. . . .

(h) *Goods.* — (1) "Goods" means any tangible personal property purchased primarily for personal, family, or household purposes, including any certificate or coupon exchangeable for it.

(2) "Goods" includes goods which at or after the time of sale are affixed to real property or become a part of it, whether or not severable from it.

(3) "Goods" does not include any:

(i) Tangible personal property purchased primarily for industrial, commercial, or agricultural purposes;

(ii) Motor vehicle, as defined in the state Motor Vehicle Law; or

(iii) Home improvement, as defined in the Maryland Home Improvement Law, or any transaction under that law.

. . . .

(1) *Retail credit account.* — (1) "Retail credit account" means an agreement or transaction for the retail sale of goods or services, which is negotiated or entered into and pursuant to which a time sale price is established.

(2) "Retail credit account" includes credit card financing by a financial institution.

(m) *Seller.* — "Seller" means a person regularly engaged in the business of selling goods to retail buyers.

(n) *Services.* — (1) "Services" means work, labor, and services furnished primarily for personal, family, or household purposes.

. . . .

**8.** Prior to Ch. 753 of the Acts of 1982, the maximum rates of finance charge for open end sales credit were 1.5% per month on that part of the outstanding balance not exceeding $700 and 1% per month on that part of the outstanding balance exceeding $700. § 506 (a) (1) and (2). The 1982 amendment applies to "that part of the outstanding balance originating on or after July 1, 1982, and before July 1, 1985." § 506 (a) (3).

by use of credit cards issued by them, under RCAL's provisions.

MCLL is Subtitle 3 of Title 12 of the Commercial Law Article. Lenders under MCLL are ordinarily required to be licensed by Maryland.[9] Maximum rates on MCLL loans are provided in § 306 (a) (6), which now provides:

> (6) Notwithstanding the provisions of paragraphs (a) (2) through (5) of this section[,] on any loan made on or after July 1, 1982, and before July 1, 1985, a lender under this subtitle may charge interest not exceeding the following rates:
>
> (i) For any loan with an original principal balance of $2,000 or less, 2.75 percent interest per month on that part of the unpaid principal balance not more than $1,000 and 2 percent interest per month on that part of the unpaid principal balance that is more than $1,000;
>
> (ii) For any loan with an original principal balance of more than $2,000, the maximum rate of interest is 2 percent per month on the unpaid principal balance of the loan.

The maximum original amount or value of a loan under MCLL may not exceed $6,000. § 303 (a). We were advised at oral argument that no national bank located in Maryland has made cash advances under a credit card plan utilizing MCLL, even after our 1973 decision in *Commissioner, supra.*

Within the Maryland classifications of the types of credit transactions that are regulated as to rate of interest or finance charge, the extension of credit for financing purchases made pursuant to a three party, open end, credit plan is a RCAL transaction. In that class of transaction, all those who extend credit are limited to the same ceiling of 2% per month. No person, under Maryland law, can extend that

---

9. These licensing provisions are Md. Code (1980), §§ 11-201 *et seq.* of the Financial Institutions Article. Section 11-202 (a) provides that MCLL "does not change any powers conferred by law on any person who is not required or permitted to be licensed" under Subtitle 2 of Title 11 of that article.

type of credit at a higher rate. Under Maryland law, a corporation which is licensed to make loans under MCLL and which also happens to be in the business of acting as a financial institution under RCAL may not charge the higher MCLL rates to finance purchases under its three party, open end, sales credit plan. The national bank that acts as a financial institution in three party, open end, sales credit is, under Maryland law, subject to no rate limitation more restrictive than that of any other person engaged in that type of transaction. No one financing purchases under a credit card plan is treated more favorably by Maryland law in relation to the permissible interest rate than national banks are treated.

Part of the confusion in applying the most favored lender doctrine arises from making comparisons without a fixed basis of reference. We start with fundamentals. *Tiffany* was decided before state regulation of interest rates and finance charges became as sophisticated, based on type of transaction, as it is today. *Tiffany* involved Missouri law. So far as the opinion reflects, the legal rate of interest in Missouri was 10%, but state banks were limited to 8%. The litigated loan made by the National Bank of Missouri was at 9%. *Tiffany,* in essence, held that national banks were not tied to the rate limited for state banks, but could charge up to the 10% allowed by Missouri to natural persons under the general statute. Today, in Maryland, the base rate of interest is 6% under § 102. There is also a higher rate statute — RCAL — which is specifically applicable to credit card purchase transactions. Thus, by interpolating the Maryland provisions into 12 CFR § 7.7310 (a), it would read:

> (a) A national bank may charge interest at the maximum rate permitted by State law to any competing State-chartered or licensed lending institution. If State law permits a higher [than the basic 6% per year] interest rate [2% per month] on a specified class of loans [credit card purchases], a national bank making such loans [credit card purchases] at such higher rate [2% per month] is subject only to the provisions of State law [RCAL]

> relating to such class of loans [credit card purchases] that are material to the determination of the interest rate. For example, a national bank may lawfully charge the highest rate permitted to be charged by a State-licensed small loan company . . . without being so licensed.

The example given in the last sentence of 12 CFR § 7.7310 (a) was the situation involved in *Commissioner.* The class of loans involved there was unsecured cash advances of $500 or less. Because the Maryland Small Loan Act permitted small loan licensees to charge on such loans interest at a rate higher than the basic 6%, and higher than the then 12% ceiling on unsecured loans, national banks could make such loans at the small loan rate.

Section 30 of the National Bank Act, 12 U.S.C. § 85, looks to the law of the state where the national bank is located to determine whether a rate of interest is permitted or is usurious. Where state law provides a medley of interest rates, depending upon the type of transaction, the determination of the applicable interest rate involves classifying the transaction. As a matter of Maryland law, credit card purchase financing is regulated by RCAL, with a rate limit of 2% per month. In the class of transactions that involve the lending of money up to $1,000, which may be without security under MCLL, national banks and MCLL lenders may charge 2.75% per month. Plaintiffs seek to take the MCLL rate and apply it to their RCAL transactions, thereby enjoying rates with respect to credit card purchase transactions which are accorded to no other RCAL lender by state law. In order for that result to come about, federal law under 12 U.S.C. § 85 must operate to obliterate the distinctions of state law which classify those transactions differently, with different rates.

The trial judge reached essentially the above-described result, in part by reliance on the words, "evidences of debt," appearing in that part of 12 U.S.C. § 85 which reads:

> Any association may take, receive, reserve, and charge on any loan or discount made, or upon any

> notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State . . . where the bank is located . . . .

As the trial court saw it, Congress used the term "interest" to cover loans, used "evidences of debt" to cover purchase transactions and intended both to be treated "indistinguishably." The National Bank Act was initially the Act of June 3, 1864, c. 106, 13 Stat. 99. The above-quoted portion of the first sentence of § 30 of the Act appeared in the 1864 version, 13 Stat. 108, except that "Any" replaced "That every" and the plural forms of "note, bill of exchange" were substituted by the Act of June 16, 1933, c. 89, § 25, 48 Stat. 162, 191. An American Bar Foundation study, B. Curran, *Trends in Consumer Credit Legislation* 2 (1965) states that "[s]ome goods were sold on an installment credit basis prior to the turn of the [19th] century, but it was not until the growth of the automobile market in the 1920's that retail installment sales first received a major thrust." The first "revolving credit" charge account, which was designed for the purchase of soft goods, has been attributed to Wanamaker's department store in 1938. Robinson, *New Developments in Retail Financing,* 8 U. Kan. L. Rev. 554, 563 (1960). Three party, open end, sales credit is an evolution which combines the role of the sales finance company in two party, closed end, secured credit with the rise of two party, open end, unsecured sales credit. In the context of this case, we are not able to find in the words of the statute an intent on the part of Congress, in the middle of the Civil War, that loans and purchases be treated "indistinguishably" for interest rate purposes.

Based on its reading of 12 U.S.C. § 85, and on certain decisions, discussed *infra,* the trial court concluded:

> The unmistakable conclusion is that Congress intended to control loans ("interest") and purchases ("evidence[s] of debt") and intended to control them indistinguishably. Therefore, while there may be statutory (and other) distinctions between credit

card loans and credit card purchases, such distinctions do not constitute sufficient generic dissimilarity to withstand the preemptive impact of the federal legislation. That is, while a credit card purchase may not involve a transaction between a conventional and traditional borrower and lender, it does involve a transaction whereby one obtains goods or services without immediate payment therefor and thus has obtained credit. He has, in effect, borrowed just as surely as if he made a direct loan from a consumer lender and then used that money to purchase consumer goods. This extension of credit centrality overrides the historical and statutory differences which otherwise would apply.

This notion of "credit centrality" homogenizes all credit transactions. If that is truly the way in which the most favored lender doctrine operates, the doctrine becomes a cannon loose on the deck of non-discriminatory, transactional classifications under state law. We do not believe that the Supreme Court decisions indicate, or that Congress intended, that the doctrine go quite so far.

The Banks assert that the "class of loan" element in 12 CFR § 7.7310 (a) is inconsistent with the preemptive effect of the words "evidences of debt" in 12 U.S.C. § 85. To support this position, Plaintiffs quote part of a passage in *National Bank v. Johnson,* 104 U.S. 271, 277, 26 L. Ed. 742, 745 (1881):

The sole particular in which national banks are placed on an equality with natural persons is as to the *rate* of interest, and not as to the character of contracts they are authorized to make . . . . [Emphasis in original.]

The language relied upon should be read in context.

*Johnson* involved interest on "discount[s] made," as that term is used in the first sentence of 12 U.S.C. § 85. A national bank located in New York had acquired negotiable promissory notes from the holder, who had endorsed them to

the bank. The purchase was at a discount, *i.e.,* the amount paid by the bank to the endorser was less than the face amount to be paid at maturity by the makers. Under New York law, *see Cram v. Hendricks,* 7 Wend. 569 (N.Y. 1831), acquisition from the payee of a valid note at a discount above the legal rate of interest was not usury, even if the payee endorsed the note. A New York statute had limited the operation of this rule as to banks by prohibiting banks from discounting at a rate greater than 7% per year. The amount of discount taken by the national bank in *Johnson* exceeded 7%. In affirming the judgment of the Court of Appeals of New York, which had determined that the bank was liable for National Bank Act usury penalties, the Supreme Court held:

> The contention of the plaintiff in error, that under this section [now 12 U.S.C. § 85] whatever by the law of the State is lawful to natural persons in acquiring title to negotiable paper by discount is lawful for national banks, cannot be sustained, and derives no countenance, as is argued, from the decision in *Tiffany v. National Bank of Missouri,* 18 Wall. 409. All that was said in that case related to loans and to the rate of interest that was allowed thereon; and it was held that where by the laws of a State in which a national bank was located one rate of interest was lawful for natural persons and a different one to State banks, the national bank was authorized to charge on its loans the higher of the two. The sole particular in which national banks are placed on an equality with natural persons is as to the *rate* of interest, and not as to the character of contracts they are authorized to make; and that rate thus ascertained is made applicable both to loans and discounts, if there be any difference between them. It is not intimated or implied that if, in any State, a natural person may discount paper, without regard to any rate of interest fixed by law, the same privilege is given to national banks. The privilege only extends to

charging some rate of interest, allowed to natural persons, which is fixed by the State law. [*Id.* at 277-78, 26 L. Ed. at 745 (emphasis in original).]

*Johnson* holds that, if the "character" of contract is a discounted purchase of commercial paper, a national bank may not discount at the rate allowed by state law to individuals, but is limited to the lower rate fixed by state law for state banks. *Tiffany,* then, does not apply to discount purchases. In other words, purchases of commercial paper at a discount by national banks are, by the National Banking Act, made subject to usury limitations even if such transactions may not be the subject of usury under state law. *See generally 7 Michie on Banks and Banking* (Perm. Ed. 1980), § 190 at 359-60 (citing *Johnson*); 2 C. Zollmann, *Banks and Banking* (1936), § 723. In terms of the instant matter, *Johnson* does not stand for transactional homogenization. With respect to "discount[s] made" as a "character of contracts," national banks are not treated as favorably as individuals enjoying no usury limitation. This federal statutory distinction in the operation of the most favored lender doctrine is based on the class of transaction.

We think that the better reasoned decisions proceed by a two step analysis in determining the applicable rate of interest where state law has a variety of rates for different transactions, and usurious interest is claimed to have been charged. First the court looks to the state statute that is designed to regulate the rate on the specific type of transaction involved. If the rate charged by the national bank exceeds that rate, and there is another statute, regulating the same class of transaction, the court looks to the other statute to determine if there is a type of lender on that class of loan who is permitted a higher rate. If there is, the national bank may permissibly utilize that higher rate when making that class of loan.

*Acker v. Provident National Bank,* 512 F.2d 729 (3d Cir. 1975), illustrates the importance of first determining the applicable state rate. Credit cardholders in that case sought damages under 12 U.S.C. § 86 on the ground that the defendant national banks had violated 12 U.S.C. § 85 by charging

usurious interest on credit card purchases. Cash advances were not involved in the plaintiffs' transactions with the defendants. As its starting point the court stated that the National Bank Act in effect " 'defers' to the laws of the state in which a national bank is located to establish the interest rate which the national bank can charge." *Id.* at 733. The difficulty was that there were two different Pennsylvania statutes, each of which was arguably applicable to the bank-operated credit card purchase plans. A section of the Banking Code established a 12% per annum rate for "install-ment loan[s]," for which the plaintiffs contended. The Goods and Services Installment Sales Act permitted 15% per annum, the rate used by the defendants. The court was "satisfied that bank-operated revolving credit card plans *in Pennsylvania* are not 'loans' governed by the Bank Code." *Id.* at 734 (emphasis in original; footnote omitted). It concluded that "the Pennsylvania legislature intended the fifteen percent (15%) rate of the Sales Act to apply to both retail sellers and financing agencies (including banks) . . . ." *Id.* at 738. If the most favored lender doctrine made install-ment loans and credit card sales financing fungible, the fact that the rate was higher under the Sales Act would have automatically resolved the issue presented. The Third Cir-cuit, however, found it necessary to determine, by applying state law, the appropriate classification for credit card pur-chase financing as a distinctly regulated type of transaction.

The way in which the most favored lender doctrine comes into play is illustrated by one aspect of *Northway Lanes v. Hackley Union National Bank & Trust Co.*, 464 F.2d 855 (6th Cir. 1972). There borrowers on commercial loans secured by real estate sought the usury penalties under 12 U.S.C. § 86 because the lending national bank had collected closing costs in addition to the maximum 7% per year interest fixed by Michigan law. When done by a bank, this was not permitted. A Michigan statute allowed a different type of lender, savings and loan associations, to be paid closing costs on the same class of loan, in addition to legal interest. It was held there was no usury on the following analysis:

> Since the above provisions operate to give Michigan savings and loan associations, a specific class of lender, a competitive advantage in the commercial real estate mortgage market, it is the opinion of this Court that national banking associations organized in the State of Michigan and making similar commercial real estate loans, should be accorded the same treatment.
>
> In this regard, the Court notes that although the loan in the instant case was separated into two parts, both were in fact commercial real estate loans within the meaning of Michigan law. [*Id.* at 863 (footnote omitted).]

The heart of the Banks' transactional homogenization argument rests on three cases which applied small loan laws to credit card plans. The earliest is *Partain v. First National Bank,* 336 F. Supp. 65 (M.D. Ala. 1971), *rev'd on other grounds,* 467 F.2d 167 (5th Cir. 1972). Involved there were a national bank's credit card operations in Alabama prior to October 1, 1971, the effective date of the Alabama Consumer's Credit Transactions Law, which adopted a 1½% per month maximum finance charge for debt created under an open end credit plan. At the time of the transactions in issue in *Partain,* it appears that the choice in Alabama was between the general usury statute, with a ceiling of 8% per annum, and the small loan law, under which 3% per month could be charged on the unpaid principal balance not in excess of $200, and 2% per month on the excess over $200 but not exceeding $300. The defendant had been operating a credit card plan under the Small Loan Act.[10] The plaintiffs claimed usury. In ruling on the defendant's motion to dismiss, the District Court stated (as reflected in the procedural history of the litigation contained in the Fifth Circuit opinion) the following (467 F.2d at 168):

---

**10.** In commenting upon the enactment of the Consumer's Credit Transactions Law, the Fifth Circuit said that "[t]here seems to have been an appreciation of the inadequacy of the Alabama Small Loan Act as a vehicle for launching banks upon credit card careers employing finance charges as here utilized." 467 F.2d at 177-78 n.9.

"This Court is clear that the correct reading of the cases of Tiffany . . . and National Bank v. Johnson . . . is that the national banks of a state are authorized to charge the highest rate of interest for any sort of lending permitted by that state. Thus, it appears that defendant and all other national banks in Alabama are allowed to charge the rate of interest authorized for small loan companies. See Title 5, § 290, Alabama Code."

The motion to dismiss was denied because of the possibility that the plaintiffs could prove overcharges under the Small Loan Act. Summary judgment was later granted by the trial court in favor of the banks because the rates of interest actually charged the plaintiffs did not exceed the small loan rates and there had never been an outstanding balance in excess of $300 in the accounts of those plaintiffs. The Fifth Circuit reversed because the method of computation utilized by the defendant involved compounding in violation of the Alabama Small Loan Act.

By the time of hearing on the summary judgment motion, the plaintiffs seem to have conceded that the defendant could use the Small Loan Act, and concentrated their attention on compliance aspects. 336 F. Supp. at 66. Speaking to the general compliance phase of the case on appeal, the Fifth Circuit said:

Obviously, national bank loans are not required in all their characteristics to fit snugly into the mold used by State lending institutions to shape their loans. A delineation of the precise extent to which conformity is required or variances permitted does not lie within the scope of this opinion. We leave for decision by the District Court if such decision becomes necessary, the question of just what provisions of the Alabama Small Loan Act "with respect to size, maturity of the loan, and the like" are binding upon defendant bank when it undertakes to operate under the aegis of that law in

Alabama. [467 F.2d at 173-74 (footnote omitted).] [11]

*Partain* did not apply transactional homogenization. Alabama interest rate law at the time apparently had one class of transaction — loans — but had two different interest rates for loans under $300, based on who the lender was. *Partain* would have presented facts more similar to those of the instant case if Alabama national banks had been charging small loan rates, in excess of 1½% per month, after the enactment of the Consumer's Credit Transactions Law, which was specifically designed to regulate open end sales credit, and which created a mold into which charges for financing open end sales credit would snugly fit.

Plaintiffs herein also rely on *United Missouri Bank v. Danforth,* 394 F. Supp. 774 (W.D. Mo. 1975). The strict holding of *Danforth* is consistent with the position taken by the State in this case. Missouri had on August 13, 1974 amended its Retail Credit Sales Act (RCSA). The Attorney General of Missouri took the position that by virtue of the amendments bank credit card plans were governed by the RCSA rates. Missouri national banks had been operating at higher rates, which were within those authorized by the Missouri Small Loan Act. The banks sought a declaratory judgment. It was held that the banks could use the small loan rates on the following analysis.

The court said that 12 U.S.C. § 85 permits "national banks to charge the rate of interest allowed to competing lenders in the state" and that the most favored lender policy "puts national banks on an equal footing with the most favored lenders in the state without giving them an unconscionable and destructive advantage over all state lenders." *Id.* at 779. A "retail seller," as defined in RCSA, included "a person who regularly grants credit to retail buyers for the purpose of purchasing goods or services from any person, pursuant to a retail charge agreement, but shall not apply to any licensee under Chapter 367 RSMo" (the

---

11. The language quoted by the court was taken by it from the Digest of Opinions of the Comptroller of the Currency, § 9510.

Missouri Small Loan Act). The court interpreted this provision to mean that small loan lenders could engage in the transactions covered by RSCA while using the small loan rates.

By expressly excepting licensees under Chapter 367 (Small Loan Companies) from the definition of "retail seller" or "seller" as defined in the Missouri Retail Credit Sales Act, the Act is thereby made inapplicable to consumer credit loans made by small loan companies licensed under Chapter 367. Thus, even though a small loan company licensed under Chapter 367 may engage in a consumer credit transaction which in all respects comes within the provisions of the Retail Credit Sales Act, the Act is inapplicable to the transaction by virtue of the fact that the "seller" is a Chapter 367 licensee, and the transaction is governed by the Missouri Small Loan Act. [*Id.* at 783-84.]

. . . .

The State of Missouri has, by excepting small loan companies licensed under Chapter 367 from the provisions of the Retail Credit Sales Act, permitted those licensees to charge the rate of interest allowed by the Small Loan Act on credit transactions, loans, "retail time transactions" and "retail charge agreements" governed by the provisions of the Retail Credit Sales Act. From the teachings of Tiffany v. National Bank, *supra,* it clearly follows that plaintiffs as national banks are entitled to charge the rate of interest permitted to those Chapter 367 licensees on their credit transactions, loans, "retail time transactions" and "retail charge agreements." [*Id.* at 784.]

. . . Assuming the correctness of the Attorney General's Opinion applying the Retail Credit Sales Act to transactions evidenced by plaintiffs' bank credit card operations, by excluding Chapter 367 licensees from the applicability of the Missouri

Retail Credit Sales Act, Missouri has in effect made small loan companies licensed under that Chapter "favored lenders" in the *class of debt* encompassed by the Retail Credit Sales Act. [*Id.* at 784 (footnote omitted; emphasis added).]

In Maryland, a corporation that is a licensed MCLL lender and that also acts as a financial institution under RCAL § 501 (g) (1) is subject to the finance charge limits of RCAL § 506 in RCAL transactions, and may not utilize MCLL rates for them. A Maryland MCLL lender is not a favored lender in relation to the Banks in RCAL financing. The discrimination present in Missouri RCSA financing, which produced the holding in *Danforth,* is absent in Maryland.[12]

12. The Banks herein assert that the preferred status of Missouri small loan companies in RCSA transactions was not determinative of the *Danforth* decision. This assertion is based on footnote 9, omitted above from the end of the last quoted portion of the *Danforth* opinion. That footnote in its entirety reads:

It is worthy to note that if the Opinion of the Attorney General is incorrect, and it is determined by Missouri Courts that persons granting credit to retail buyers for the purpose of purchasing goods and services pursuant to a retail charge agreement, although included in the definition of "seller" in the Retail Credit Sales Act, are not engaging in "retail time transactions" and "retail charge agreements" as defined by the Act, then possibly Chapter 367 licensees would not be considered "favored lenders" when compared to lenders not actually regularly selling retail goods or services to buyers. Such a determination would not, obviously, subject plaintiffs' bank credit card operations to the "time charge" limits of the Retail Credit Sales Act, but could possibly bear on the validity of the exemption of Chapter 367 licensees under Article 3, § 44 of the Missouri Constitution. See Household Finance Corp. v. Shaffner, 356 Mo. 808, 203 S.W.2d 734 (1947).

The Missouri RCSA definition of "retail seller," as seen above, contains language compatible with a three party plan. However, the RCSA definition of "retail charge agreement" was couched in terms arguably appropriate only to a two party plan. One of the contentions of the Missouri banks, which was not decided in *Danforth,* was that the Attorney General's opinion was incorrect and that three party plans were not covered by RCSA. What footnote 9 says is that if RCSA did not cover three party plans, the Missouri banks would not be subject to its rate limitations, just as small loan companies were not covered as a result of express definitional exclusion. Under that hypothesis, Missouri small loan companies would "possibly" not be considered favored lenders in comparison to credit card issuers who sold no goods or services.

The qualifier "possibly" was likely inserted because the court did not complete the analysis on the alternative theory. If credit card purchases were not covered by RCSA, the result might be that there would be no rate

Of significance to the argument of the Banks here is the *Danforth* conclusion that Missouri small loan lenders were in competition with credit card issuing banks. The *Danforth* court said that "[i]n both instances, the borrower or buyer incurs a debt for the purpose of purchasing retail goods or services and defers payment over a period of time." 394 F. Supp. at 783. One might question the generality of the assumption that the proceeds of a small loan are necessarily to be used for the purchase of goods or services. However, the opinion later moved back within the transactional frame of analysis. It was said to be "irrelevant that competing state lenders are not at the present time engaging in the same particular type or class of loan or credit transaction as national banks" and that the "important determination is whether competing state licensed or chartered lenders *may* engage in the particular type or class of loan, and the rate of interest they *may* charge in connection therewith." *Id.* at 784 (emphasis in original).

*Fisher v. First National Bank,* 548 F.2d 255 (8th Cir. 1977) is the third decision principally relied on by the Banks. There the plaintiff claimed usury in his credit card account. The court's analysis applied Nebraska law. The transactions involved occurred before January 1, 1976, the effective date of a Nebraska statute which provided that the interest rate on credit extensions initiated by a bank credit card would be governed by the statutes dealing with personal loans made by banks. Thus, as in *Partain,* the legal setting at the time of the facts in *Fisher* did not include a state statute identifying three party, open end, sales credit as a particular class of transaction and establishing a rate of finance charge for that class. However, Nebraska did have at the relevant time (1) a general statute limiting interest to 9% per annum, (2) a small loan law, applicable to loans up to $3,000, with a declining scale of interest beginning with 30% per annum up to the first $300, (3) a statute covering two party revolving charge agreements with an 18% per annum rate limit on the first $500, and a 12% limit above that

limitation, or Missouri might contend that a loan statute rate applied. In the latter event, the small loan lender might still be favored.

outstanding balance amount, (4) a statute governing install-ment sales contracts, with a declining permitted rate beginning at 9% per annum on the first $1,000, and (5) a statute relating to bank installment loans which permitted 18% on the first $1,000 and 12% per annum on the excess. Under the latter statute banks were permitted to charge in lieu of interest a flat fee of $5.00 on "small loans." [13] The *Fisher* court concluded that the Supreme Court of Nebraska would apply the bank installment loan statute, as most closely analogous to credit card financing. Inasmuch as 18% had been the rate ostensibly charged by the defendant, and the plaintiff's balance had never approached $1,000, this would have been the end of the matter. However, the plain-tiff disputed the method of computing the 18% rate and com-putation was complicated by a $5.00 flat charge which had been assessed with respect to a $250 cash advance. The dis-trict court had granted a summary judgment for the bank on the theory that the bank could have used the small loan rate so that the computational dispute was immaterial. This holding was affirmed.

The Eighth Circuit articulated the most favored lender doctrine as meaning that "a national bank is not limited to the interest rate that a state bank may charge with respect to a particular type of loan if another lender in the state is permitted to charge a higher rate of interest on the same type of loan." *Id.* at 259.

Applying a transactional homogenization analysis, the appellate court, despite its earlier conclusion that the Bank Installment Loan Act applied, held that the bank was enti-tled to charge Small Loan Act rates. The court said (*id.* at 260):

> While a licensed maker of small loans in Nebraska and a state or national bank in Nebraska are lenders of different types, and while small loans companies doubtless make loans that banks would not make, there is really no essential difference be-

---

**13.** The quoted language is the term used in Neb. Rev. Stat. (1943, 1974 Rev.), § 8-820.

tween the type of consumer loan that is made by a small loan company and the type of consumer loan that is made by the defendant bank on the basis of a credit card transaction. Whether the loan is made by a small loan company or whether it is made by a bank, it is a consumer loan which may be repaid in installments. In other words, if a person desires to buy merchandise worth $100.00 on installment credit, it makes no practical difference whether he gets the money from a small loan company and pays cash for the merchandise or whether he obtains the merchandise in the first instance by using a credit card and ultimately discharges the obligation by installment payments to the bank.

*Fisher* also quoted liberally from *Danforth.* The quotations from *Danforth* included the passage pointing out that the exclusion of Missouri small loan lenders from that state's Retail Credit Sales Act made those licensees "favored lenders" in the class of transaction encompassed by that statute. That passage was used as a basis for the holding despite the inapplicability of the relationships between credit grantors in Missouri RCSA type transactions to the Nebraska legal setting.

This Court is not bound by any of the foregoing three decisions, and we are particularly unpersuaded by the reasoning of *Fisher.* The legal analysis of a transaction, as a sale, subject to one set of rules, or as a loan, subject to a different set of rules, is not controlled by whether the consumer cares if he is paying a seller or a bank.

The parties here have also supplied a number of letters, written by the staff of the Office of the Comptroller of the Currency (OCC), interpreting the most favored lender doctrine. Most of these letters are unreported and most of them, including the few which deal with credit card transactions, cast very little light on the problem at hand. An OCC letter of June 17, 1980 (Fed. Banking L. Rep. (CCH) ¶ 85,235) responded to an inquiry from a Nebraska state legislator concerning increases in credit card rates by First National

Bank of Omaha. It pointed out that *Fisher, supra,* was completely dispositive of the central inquiry in the letter.

A later OCC letter of January 12, 1981 (Fed. Banking L. Rep. (CCH) ¶ 85,259) indicates that the problem is more complex than as presented in the Plaintiffs' position. Michigan law furnished the legal setting. Unique to this situation was that the Retail Installment Sales Act flat rate of 1.7% per month (20.4% per year) was an even higher rate on balances from $500.01 to $3,000, than that provided by the Small Loan Act.[14] The ruling first concluded that the RISA denomination of the rate as a "time price deferential" did not preclude the national bank from utilizing RISA's rate "on transactions with its credit card customers which come within the scope of RISA." Fed. Banking L. Rep. (CCH) ¶ 85,259 at p. 77390. It was further opined:

> Your third question relates to the fact that RISA excludes certain transactions from its coverage. Specifically, RISA does not apply to transactions involving "motor vehicles, money, things in action or intangible personal property or the equivalent thereof," [Mich. Comp. Laws] § 445.852 (a), various types of educational services, [Mich. Comp. Laws] § 445.852 (b), and various types of professional services, [Mich. Comp. Laws] § 445.852 (e). Your question is whether [the bank] may charge the interest rates set by RISA on these excluded transactions. My review of RISA indicates that [the bank] may not employ RISA's rates for these excluded transactions since the transactions to which a specific interest rate may or may not apply under

---

14. Under the Small Loan Act a licensee could charge either (a) 31% per year up to $500 or less of unpaid principal balance, but only 13% per year on the balance in excess of $500 up to the maximum loan amount of $3,000; or (b) 18% per year. Mich. Comp. Laws Ann., § 493.13 (1967, 1982-83 Supp.). The general interest and usury statute set the rate at 5% per year, or at 7% per year if the loan agreement were in writing. Mich. Comp. Laws Ann., § 438.31 (1978). State chartered banks "[o]n any loan made pursuant to an existing credit card arrangement ... whereby the bank ... pays or agrees to pay the borrower's obligations ... or advances money to or for the account of the borrower ..." were limited to 1.5% per month (18% per year). Mich. Comp. Laws Ann., § 487.491 (a) (1967, 1982-83 Supp.).

state law are "material" to the determination of that rate of interest. Therefore, [the bank] may not, as you suggest, charge RISA's interest rates on cash advances to its credit card customers. It will, of course, be [the bank]'s responsibility (if it decides to charge RISA's rates to its credit card customers) to establish controls to ensure that the higher rates are not charged on excluded transactions.

Thus, in the view of OCC staff, the Michigan bank could use RISA rates for credit card purchases but not for credit card loans. They were different classes of transactions, or the exclusion of loans from the sales rate was "material to the rate," because Michigan law said so.

The inversion of part of the rate structure under Michigan law from that ordinarily found furnishes an interesting test of the logic of a decision like *Fisher*. If the higher rate law applies to financing sales and not to loans, it may not be applied to loans by national banks, per the OCC letter. In Maryland RCAL financing is limited to sales of goods and services. It makes no more sense to us for a national bank to transport a higher rate from a lending of money law into a sales of goods and services financing law than it made to the OCC staff for a national bank to transport the rate from a financing of sales of goods and services law into a lending of money transaction. If A does not equal B, then B does not equal A.

The most recent United States Supreme Court decision applying 12 U.S.C. § 85, while not directly on point, suggests that the correct analysis looks to the state statute which is intended to regulate the type of transaction involved. *Marquette National Bank v. First of Omaha Service Corp., supra*, 439 U.S. 299, arose out of competition in the Minnesota market between an Omaha, Nebraska national bank and a national bank located in Minnesota. Both were BankAmericard issuers. The Omaha bank had systematically sought to enroll in its program residents, merchants and banks in Minnesota. In describing the legal setting out of which the litigation arose, the Court said:

Minnesota residents are obligated to pay Omaha Bank interest on the outstanding balances of their BankAmericards. Nebraska law permits Omaha Bank to charge the interest on the unpaid balances of cardholder accounts at a rate of 18% per year on the first $999.99, and 12% per year on amounts of $1,000 and over. Minnesota law, however, fixes the permissible annual interest on such accounts at 12%. To compensate for the reduced interest, Minnesota law permits banks to charge annual fees of up to $15 for the privilege of using a bank credit card. [*Id.* at 302-03, 99 S. Ct. at 542-43, 58 L. Ed. 2d at 538-39 (footnotes omitted).]

The Minnesota law by its terms applied to state and national bank credit card plans and fixed the 12% rate both for loans and for purchase transactions. Minn. Stat. § 48.185 (1978). In its suit the Minnesota bank sought to enjoin the Omaha bank from soliciting participants unless the Omaha bank complied with the Minnesota statute. It was held that the Omaha bank could export the Nebraska rate.

It is noteworthy that Minnesota had a small loan law which is not mentioned in the discussion. *See* Minn. Stat. Ann. § 56.13 (1970). The Small Loan Act allowed higher rates than the credit card statute. At the time the *Marquette* litigation arose, a licensed lender under the Minnesota Small Loan Act could charge 2¾% per month on the first $300, 1½% per month on a balance over $300 and not over $600, and 1¼% on the excess up to a loan maximum, fixed by 1974 Minn. Laws, c. 412, of $1,200. Yet the Minnesota and Nebraska national banks, and the Supreme Court, all started from the premise that the rights of a card issuing national bank located in Minnesota were fixed by the Minnesota credit card statute.

If the most favored lender doctrine obliterates state law non-discriminatory classifications of transactions, then consequences result which could never have been intended by Congress. For example, a middle-aged married couple in Maryland, whose children are raised, and who own their own home clear of any liens, might borrow money on a first mort-

gage for the purpose of completely refurnishing the house. Under the conditions specified by Md. CL § 103 (b), there is no limit on the rate of interest in such a transaction. The couple might instead choose to buy the furniture under a credit card plan, particularly if their credit limit is high. If, under federal law, the possibility that loan proceeds might be used to purchase goods makes the highest loan rate also applicable to credit card purchase transactions, then the MCLL rate would not be the legal limit. Under the logical extension of Plaintiffs' argument, there would be no limit because there is no limit on residential mortgage loans and because the proceeds of a residential mortgage loan might be used to make purchases.

DIDA, however, makes clear that no such far-reaching result was ever intended. Part of DIDA, 94 Stat. 161, amends the National Housing Act by adding 12 U.S.C. § 1735f-7 note. This section preempts state law establishing an interest ceiling on certain "federally related" loans secured by a first lien on residential real property, and in effect legislates that there be none. Such federally related loans may be made by federally chartered and federally insured, state chartered, savings and loan associations. *See* 12 U.S.C. §§ 1735f-7 note (a) (1) (C) and 1735f-5 (b) (2). DIDA also enacted 12 U.S.C. § 1831(d) under which the state chartered, federally insured, Banks claim the benefit of the most favored lender doctrine. Undoubtedly Congress would be shocked to find that the combination of these provisions has preempted all state interest and finance charge limitations on national banks, and on federally insured state banks, throughout the entire United States, simply because certain savings and loans, on what was thought to be but one class of loan, have no rate limit at all.

Here, Maryland law treats equally all those who finance credit card purchases. There is no need to look beyond RCAL to any other rate law, in order to protect national banks doing RCAL lending, because no lender is permitted in Maryland to transfer a higher rate into RCAL. Unsecured cash advances and credit card purchase financing are, in Maryland, different classes of "loans" within the meaning of

12 U.S.C. § 85, as interpreted in 12 CFR § 7.7310 (a). This Court rejects the notion that different types of transactions in which credit is extended all become a single class of loan under 12 U.S.C. § 85, because of the common denominator of credit.

We reverse on the first issue and remand for the entry of a judgment declaring that the Plaintiffs may not charge rates in excess of those permitted by RCAL on purchase transactions financed under their credit card plans.[15]

## II

Plaintiffs also contend that the only provisions of MCLL with which they are required to comply in their credit card operations are those that fix the numerical rate (§ 306 (a) (2)-(7)) and that fix the maximum amount of loan (§ 303 (a)).[16] The trial court concluded that the Plaintiffs were, in addition, required to comply with §§ 303 (b), (c), (d), 306 (a) (1), (b), (c), (d), (e), 307, 308 (c), 309, 310, 311, 312 and 313 (a) (1) and (2). These statutes, as amended to date, are set forth in an appendix to this opinion.

The opinion of the trial court, and the briefs of the parties in this Court, all treat the foregoing declaration as applicable in all of its particulars to credit card loans, as well as to purchases. Consequently, we shall review this phase of the trial court's judgment as it pertains to credit card cash advances.

12 CFR § 7.7310 (a) provides that a national bank making loans at a higher rate permitted by state law on a specified class of loans "is subject only to the provisions of State law relating to such class of loans that are material to the determination of the interest rate."

---

**15.** Consequently it is unnecessary to determine whether the 25 day "free-ride" on finance charges, provided for credit card purchases by CL § 506 (c) (2), would apply to a Bank plan using MCLL rates. Nor need we decide, as part of Issue II, whether the merchant discount and interchange fees received by the Banks on credit card purchase transactions should be considered part of the interest charged by the lender under MCLL.

**16.** Subsections (6) and (7) of § 306 (a) became effective July 1, 1982 under Chapter 753 of the Acts of that year. While they were not in effect when this case was argued below, or when it was briefed and argued in this Court, any declaration of rights must necessarily encompass them.

Plaintiffs' position is that the only provisions material to the determination of the rate are the numerical rate itself and any dollar amount of principal to which a specific rate is limited by state law. The Banks rely heavily on a sentence appearing in *Evans v. National Bank,* 251 U.S. 108, 111, 40 S. Ct. 58, 59, 64 L. Ed. 171, 175 (1919) which states that the National Bank Act "adopts usury laws of the States only insofar as they severally fix the rate of interest." The Court cited three decisions in support of its statement. Two of the cited cases stand for the generally accepted proposition that the penalties for violation of the usury provisions of 12 U.S.C. § 85 are established by 12 U.S.C. § 86, and not by state law. *Farmers' and Mechanics' National Bank v. Dearing,* 91 U.S. 29, 23 L. Ed. 196 (1875) and *Haseltine v. Central Bank,* 183 U.S. 132, 22 S. Ct. 50, 46 L. Ed. 118 (1901). The holding of the third decision, *National Bank v. Johnson, supra,* has been discussed above, in Part I.

*Evans* was an action for usury penalties. It dealt with interest at the maximum Georgia rate of 8%. A then recent decision of the Georgia Supreme Court had held that discounting at the highest rate permitted on a loan was usurious. Eight per cent (8%) interest had been deducted in advance by the defendant national bank from the proceeds of loans which were repayable within a short time, without any installment payments required to be made prior to the maturity date of the entire face amount of principal. It was held there was no usury. Based on long standing and commonly accepted banking practice, as well as on references to discounting appearing in the corporate powers and usury sections of the National Bank Act (now 12 U.S.C. §§ 24 and 85), the Court concluded that the right to retain advance interest by way of discounting a loan was a right which arose from federal law, and that federal law permitted discounting at the maximum state rate, in spite of the state law prohibition of discounting at that rate.

There is a conflict among the United States Courts of Appeals as to the reach of the *Evans* holding. The Eighth Circuit considers that *Evans* represents a narrow exception to the otherwise general rule under which determination of

"the 'rate allowed by the laws of the State' can only be accomplished with reference to state court interpretations of the state's own constitution and statutes." *First National Bank v. Nowlin,* 509 F.2d 872, 876 (8th Cir. 1975). That court viewed *Evans* as confined to loans calling for a single payment at the end of a short term. It was held that taking interest, by discounting in advance, on loans calling for installment payments over 12 and 36 months, was usurious where it had produced effective interest at rates in excess of the Arkansas Constitution's 10% limit for any loan. In so holding the Eighth Circuit disagreed with part of the Sixth Circuit's 1972 decision in *Northway Lanes v. Hackley Union National Bank & Trust Co., supra,* 464 F.2d 855. Under the authority of *Evans,* the *Northway* court approved the discounting at 7% of interest on a commercial, secured, installment loan, made to individuals, and calling for 40 monthly payments. It was deemed immaterial, pursuant to *Evans,* that the effective yield of the loan thereby exceeded the maximum state law permitted interest rate.

We are not directly concerned here with the discounted interest conflict engendered by *Evans.* The only indication in the record before us, which concerns the practices of one of the Banks in charging interest on credit card cash advances, reflects that interest is computed as earned, by applying a daily rate to the average daily balance of loan principal outstanding. But when we put the discounting conflict to the side, it appears that *Evans* does not stand for the proposition that national banks may utilize the most favored lender rate and disregard other provisions of state law which are relative to applying that rate (except perhaps, as to discounting). Thirteen years before *Evans* was decided, *Citizens' National Bank v. Donnell,* 195 U.S. 369, 25 S. Ct. 49, 49 L. Ed. 238 (1904) affirmed a Missouri Supreme Court judgment by which interest was forfeited on a loan made by a national bank, because the interest had been compounded more than once a year in violation of Missouri statute. It was argued by the bank that compounding did not affect the rate of interest so that compounding was not prohibited by the National Bank Act's incorporation of state law. It was also

argued that if the amount charged as a result of compounding were less than the maximum amount that might otherwise have been charged, there was no violation. Justice Holmes for the Court said:

> The rate of interest which a man receives is greater when he is allowed to compound than when he is not, the other elements in the case being the same. Even if the compounded interest is less than might be charged directly without compounding, a statute may forbid enlarging the rate in that way, whatever may be the rules of the common law. The Supreme Court of Missouri holds that that is what the Missouri statute has done. On that point and on the question whether what was done amounted to compounding within the meaning of the Missouri statute, we follow the state court. [*Id.* at 374, 25 S. Ct. at 50, 49 L. Ed. at 241.]

The majority opinion in *Evans* (a 6-3 decision) does not cite *Donnell* and apparently does not consider *Donnell* to be inconsistent with the holding in *Evans.*

Consequently, the national bank that takes a most favored lender's rate may not take only the numerical rate. It must also take the method of calculating that rate, except that the discounting of some loans, the class of which is unresolved, is permitted by supervening federal law. Nor may the national bank enlarge the rate charged, in a way prohibited by state law, even if the resulting charge is within the legal limit if done directly.

But rejecting Plaintiffs' numerical rate argument does not resolve the matter. Essentially we are in virgin territory, from the standpoint of precedent, when deciding what parts of MCLL, a closed end loan statute, are material to open end cash advances.

As we see it, 12 U.S.C. § 85 is the usury statute for national banks. By using that statute, and the state law which is brought into it, a court is to decide, in a specific case based on a specific transaction, whether the state interest limitations incorporated by reference in § 85 have been

violated. Provisions are "material to the determination of the interest rate" if they are material to a judicial determination of whether or not the interest charged in a given transaction is unlawful. We shall apply this general principle to the specific sections of MCLL which are the subject of Plaintiffs' cross-appeal.

Section 313 (a) (1) presents a fundamental concept of MCLL. It is prohibited for a lender "[d]irectly or indirectly" to "contract for, charge, or receive any interest, discount, fee, fine, commission, charge, brokerage, or other consideration in excess of that permitted by" MCLL. A MCLL licensed lender is bound by the contractually stated rate of interest in a given transaction, which must be within the MCLL rate limits, and is limited to the additional charges permitted by MCLL. That is all of the consideration which the MCLL licensed lender may lawfully receive for the use of the money. Under MCLL § 313 (a) (1) it is not simply a question of whether an unpermitted additional fee, when added to the contractually stated interest, will produce total consideration which, in relation to the length of time the principal, or any part thereof, has been outstanding, exceeds the statutory rate limit. Contracting for, charging or receiving the unpermitted additional fee is unlawful in itself. Thus, under the rationale of *Citizens' National Bank v. Donnell, supra,* § 313 (a) (1) is material to the rate.

Section 303 (a) is recognized by all as material because it establishes a $6,000 maximum loan amount.

Section 303 (b) in its entirety is material. It in general makes the furnishing of consideration in exchange for an assignment of wages a loan for MCLL purposes, and declares that interest on the loan is to be measured by the difference between the wages assigned and the consideration paid for the assignment.

Section 303 (c) (1) is material. The subject is an ostensibly unsecured loan which is, in reality, secured. For security purposes a lender pretends to purchase property from the borrower which the borrower is permitted temporarily to keep in his possession. If the lender recovers the property, as "owner" and "buyer," but does not credit the loan balance

with the amount realized on the security, interest charged at an apparently lawful rate on a balance which should have been lower because of the deserved credit, can exceed the maximum and be usurious.

"[A]ny device or pretense of charging for [the lender's] services" by which the lender "seeks to obtain any interest, charges, discount or like consideration" is brought within MCLL by § 303 (c) (2). It deals with interest which is sought to be disguised as a service charge. As such the amount of interest is increased above the ostensible rate. The true rate may exceed the legal maximum. It would also be an unpermitted additional charge under § 313 (a) (1). Section 303 (c) (2) is material.

Section 303 (d) is material in its entirety. It takes the transaction of lending in excess of $6,000 out of MCLL, so that the special rate is not applicable; it additionally prohibits the splitting of a loan in excess of $6,000 into two or more loans of an ostensibly lesser amount. Section 313 (a) (2) is similar to § 303 (d) (2) (ii) and prohibits splitting a loan of $6,000 or less in order to obtain the higher of the step rates. Section 313 (a) (2) is material.

Section 306 (a) states the numerical rate and is material in its entirety.[17]

Section 306 (b) is material. It provides that if "any principal balance remains unpaid 6 months after the loan matures as originally scheduled or deferred," the interest drops to 6% per annum, simple interest. The trial court found, on ample record support, that the minimum payment requirements of a revolving account make a maturity date determinable on any particular cash advance. Also, on any delinquent account in which further credit is refused, the principal balance will become fixed. If a plan contains an acceleration provision which is exercised after a given number of delinquencies, a maturity date would thereby be fixed. In a given case the continued charging of interest to the

---

**17.** This section, both before and after its 1982 amendment, contains step rates. The parties have not briefed the question of how the MCLL step rates are to be applied in a revolving loan account and we express no opinion thereon.

matured balance would clearly be subject to the § 306 (b) reduced rate requirements.

Section 306 (c) deals with refinancing of loans. While it may not be relevant to the ordinary operation of a revolving loan account, such accounts might be terminated by the lending bank for default. There could be special negotiations with respect to reopening, in which the restrictions of this section would be material.

Section 306 (d) deals with the computation of interest. It may not be taken in advance or compounded. The section is material to the rate as to the compounding prohibition. Because there is no indication that interest is taken in advance on credit card cash advances, a ruling on the prohibition against taking interest in advance is beyond the scope of this controversy.

This brings us to § 306 (e) which fixes the maximum duration for MCLL loans of various principal balances. It is the most hotly contested feature of this aspect of the case between the parties. This is because, in a revolving account, the lender does not currently program, in his computerized record of the borrower's account, to track how long a given cash advance has been outstanding. Lenders currently do not keep cash advances segregated, one from another, in their records for the purpose of applying principal payments to the oldest incurred portion of the total principal balance that is brought forward into a new billing period. The problem arises from the fact that MCLL contemplates closed end lending and the Plaintiffs seek to apply MCLL to open end transactions.

The Plaintiffs say that forcing their open end cash advance plans into the mold of MCLL provisions establishing a maximum term will destroy their right to be treated equally with the most favored lender and thereby violate 12 U.S.C. § 85. Based on sufficient evidence, the trial court concluded that tracking of the dates of cash advances in relation to a maximum maturity date can reasonably be accomplished, so that the factual predicate for Plaintiffs' argument is missing.

We agree with the trial court's conclusion that a given cash advance in open end credit has a maturity date for MCLL rate borrowing purposes, because one can calculate from the plan's minimum payment requirements when the cash advance will be paid in full, if a given debit to principal is considered separately from any later, additional debits to loan principal. If that maturity date exceeds the MCLL loan duration limit, one of three results would seem to follow. First, it may be that the entire transaction is one which does not fall within MCLL's special rate provisions, so that the entire loan would be usurious. Secondly, it may be that interest taken for the period after the maximum maturity date is to be calculated as earned within the permitted duration of the loan. This would increase the amount of interest attributable to the maximum loan period, and could result in an attributed rate of interest in excess of the maximum rate. Thirdly, because § 306 (b) does not mandate that the contract interest drop to 6% until six months after the loan matures, it may be that the maturity date of a given cash advance will fall beyond the maximum loan term specified by § 306 (e), but that the continued application of the contract rate to the matured balance does not constitute usury unless that rate is applied more than six months after loan maturity. We need not resolve these questions in this case. They must await a specific state of facts arising in the context of the contractual provisions of the plan under which the loans were made. Sufficient for this declaratory judgment action is our holding that, under any of these alternatives, the maximum term of a loan under § 306 (e) is material to determining whether the permitted rate has been exceeded.

Section 307 (a) deals with one aspect of a secured MCLL loan that is acknowledged by the lender to be a secured loan. An MCLL loan may be secured or unsecured. Bank credit card loans, which are the subject of this phase of the present action, are unsecured insofar as the record discloses. Thus, the provisions of § 307 (a) are beyond the scope of this controversy.

Under § 307 (b) the lender may collect a $5.00 fee if payment is attempted to be made by check which is

dishonored on the second presentment. The effect of this provision is to take such payments out of the operation of §§ 303 (c) (2) and 313 (a) (1). If a determination had to be made as to whether unlawful interest had been charged, a fee paid pursuant to the authorization of § 307 (b) would not be included in the amount of interest charged when determining the rate of interest actually applied. Section 307 (b) is material to the rate.

Section 308 (c) (1) in essence prohibits prepayment penalties. If a prepayment penalty were collected, it would, under § 313 (a) (1), be an unpermitted additional fee paid by the borrower for the use of the lender's money. Section 308 (c) (1) is material to the rate of interest.

Section 308 (c) (2) requires part payments to be applied first to accrued interest to the date of payment, and then to unpaid principal. This subsection defines how one determines "that part of the unpaid principal balance" to which is applied the monthly rate of interest specified in § 306 and is therefore material.

Section 309 makes the MCLL lender subject to claims or defenses which the borrower may have against a seller of goods under the circumstances therein provided. A claim or defense which prevails because of rights conferred by § 309 may result in a reduction of principal and, as a consequence of that reduction, result in a reduction of the amount of interest paid. However, it has nothing to do with the rate of interest charged, or in determining whether interest has been charged at an unlawful rate. It is not material to the rate of interest.

Section 310 describes certain circumstances in which "any profit or advantage" received by the lender "by a collateral . . . agreement in connection with . . . making a loan is considered a charge for the loan," subject to the exceptions of § 310 (b). For example, if an MCLL lender makes a loan which enables the borrower to purchase a used car, and the used car dealer kicks back part of his profit on the transaction to the MCLL lender, the kickback "is considered a charge for the loan," and thereby increases the interest. Section 310 is material to the rate.

Section 311 deals with prohibitions on security and, for the reasons stated *supra* in reference to § 307 (a), is beyond the scope of this controversy.

Section 312 describes the circumstances under which a lender may collect from the borrower, at the borrower's option, the premiums paid for certain types of insurance. Insofar as § 312 deals with accident and health insurance, credit life insurance and insurance against unemployment, it is material to the rate. Amounts paid by the borrower to the lender, as authorized by this section, are not interest or unpermitted additional charges, and would not be included in the calculation of amounts obtained by the lender as interest, when determining whether the amount actually charged exceeded the lawful rate. Insofar as the insurance described under § 312 covers property pledged as security pursuant to § 312 (a) (1), a ruling thereon is beyond the scope of this controversy.

The remaining issue deals with the "interchange fee" which operates at least within the VISA credit card system of which some of the Plaintiffs are members. As described in the evidence, the fee comes into play when the cardholder makes a purchase from a merchant who participates in the plan of a bank which is not the bank issuing the card to the cardholder. As we read the evidence, and as the briefs of all parties treat the fee in such a transaction, it is paid by the merchant signing bank to the card issuing bank. However, the trial court opinion describes the operation of the fee in such transactions as paid by the card issuing bank to the merchant signing bank. The State had argued below that the interchange fee received by a Maryland card issuing bank should be deemed an indirect fee within the meaning of § 313 (a) (1). The trial court held that the interchange fee is not material to the rate and the State has appealed from that declaration. There is no direct evidence that the interchange fee applies on cash advances. There is a statement by a witness from VISA, called by the Plaintiffs, that the charge "is appropriate to every transaction which goes through interchange," but it is unclear in the context whether this refers solely to sales transactions or to both

sales and loan transactions. Because the total emphasis in the testimony and in the trial court's opinion was on sales transactions with respect to the interchange fee, and because the master agreement governing the relationship between banks participating in the VISA system is not in the record, we are unable meaningfully to review the trial court's determination on this point. We shall therefore vacate that portion of the trial court's judgment which declares that the interchange fee is not material to the rate, without affirmance or reversal, and remand that point for such further proceedings as may be required.

In sum, provisions material to the rate are §§ 303 (a), (b), (c) (1), (c) (2), and (d); 306 (a), (b), (c), (d) (as to compounding), and (e); 307 (b); 308 (c) (1) and (c) (2); 310; 312 (a) (2), (a) (3), (a) (4), (b), (c) (2), (c) (3), (c) (4), and (e); and 313 (a) (1) and (a) (2). Section 309 is not material to the rate. The rulings on § 306 (d), as to the taking of interest in advance, §§ 307 (a), 311, 312 (a)(1), and 312 (c)(1) are vacated without remand. The ruling on interchange fees is vacated with remand.

> *Judgment of the Circuit Court of Baltimore City affirmed in part, reversed in part and vacated in part and case remanded for further proceedings and for the entry of a declaratory judgment consistent with this opinion.*
> *Costs of this appeal to be paid 95% by the plaintiffs below and 5% by the defendants below.*

*APPENDIX*

Sections of the Maryland Consumer Loan Law, as amended, that the trial court held to be material to the determination of the interest rate.

## § 12-303. Application of subtitle.

(a) *Amount of loan.* — A lender may not make a loan under this subtitle unless the loan is in an original amount or value which does not exceed $6,000.

(b) *Purchase or assignment of wages considered a loan.* — (1) The purpose of this subsection is to prevent evasion of the provisions of this subtitle by means of a purchase or assignment of wages.

(2) For the purposes of this subtitle:

(i) The payment of $6,000 or less in money, credit, goods, or things in action as consideration for any sale, assignment, or order for the payment of wages, whether earned or to be earned, is considered a loan of money secured by the sale, assignment, or order for payment of wages; and

(ii) The amount by which the wages exceeds the consideration paid for them is considered interest or charges on the loan from the date of the payment to the date the wages are payable.

(3) The transaction described in this subsection is governed by and subject to the provisions of this subtitle.

(c) *Pretended purchase of property or of services considered loan.* — This subtitle applies but is not limited to a lender who:

(1) As security for a loan, use, or forebearance of money, goods, or things in action or for any loan, use, or sale of credit, whether or not the transaction is or purports to be made under this subtitle, makes a pretended purchase of property from any person and permits the owner or pledgor to retain possession of the property; or

(2) By any device or pretense of charging for his services or otherwise, seeks to obtain any interest, charges, discount, or like consideration.

(d) *Loans in excess of $6,000.* — (1) A lender who lends or contracts to lend an amount which exceeds $6,000 may not directly or indirectly contract for, charge, or receive any interest, fee, or other charge in excess of that which he would be permitted to charge if he were not authorized to make loans under this subtitle.

(2) The provisions of this subsection apply to any debt in excess of $6,000 which is directly or contingently owed or contracted to be so owed by any person jointly or severally:

(i) Whether as a borrower, an endorser, guarantor, or surety for a borrower, or otherwise; and

(ii) Whether the debt is part of a single transaction or the aggregate of more than one transaction.

## § 12-306. Interest on loan.

(a) *Maximum interest rate permitted.* — (1) Except as provided in subsections (b) and (c) of this section, a lender may charge interest on a loan at a rate not more than the rate specified in this subsection.

(2) For any loan with an original principal balance of $2,000 or less, the maximum interest rate is:

(i) 2.75 percent interest per month on that part of the unpaid principal balance not more than $500;

(ii) 2 percent interest per month on that part of the unpaid principal balance that is more than $500 but not more than $700; and

(iii) 1.25 percent interest per month on that part of the unpaid principal balance that is more than $700.

(3) For any loan with an original principal balance of more than $2,000 and not more than $3,500, the maximum interest rate is 1.75 percent interest per month on the unpaid principal balance of the loan.

(4) For any loan with an original principal balance of more than $3,500 and not more than $5,000, the maximum

interest rate is 1.5 percent interest per month on the unpaid principal balance of the loan.

(5) For any loan with an original principal balance of more than $5,000, the maximum interest rate is 1.35 percent interest per month on the unpaid principal balance of the loan.

(6) Notwithstanding the provisions of paragraphs (a) (2) through (5) of this section on any loan made on or after July 1, 1982, and before July 1, 1985, a lender under this subtitle may charge interest not exceeding the following rates:

(i) For any loan with an original principal balance of $2,000 or less, 2.75 percent interest per month on that part of the unpaid principal balance not more than $1,000 and 2 percent interest per month on that part of the unpaid principal balance that is more than $1,000;

(ii) For any loan with an original principal balance of more than $2,000, the maximum rate of interest is 2 percent per month on the unpaid principal balance of the loan.

(7) A loan may be made pursuant to subsection (6) provided that:

(i) If the loan is a renewal or refinancing of a loan made prior to July 1, 1982, the lender complies with section 12-116 of this title;

(ii) If the loan includes a provision for a rate of interest which may be adjusted by the lender during the term of the loan, the lender complies with section 12-118 of this title;

(iii) Upon the borrower's default, if the loan is secured by personal property, the lender complies with section 12-115 of this title concerning repossession and redemption of the goods securing the loan; and

(iv) The loan does not include a balloon payment, unless payment in full is due on demand or in 1 year or less.

(b) *Interest on balance unpaid after original maturity date.* — If any principal balance remains unpaid 6 months after the loan matures as originally scheduled or deferred, the lender may not contract for, charge, or receive interest at a rate exceeding 6 percent simple interest per annum on the actual unpaid principal balances from time to time.

(c) *Refinanced loan.* — If the lender refinances a loan in the ordinary course of business, he may not add to the principal balance or deduct from the proceeds of the new loan more than 60 days' interest then due.

(d) *Computation of interest.* — (1) The lender shall compute interest on the actual unpaid principal balances outstanding from time to time, and he may not contract for, charge, or receive interest in advance or compounded interest.

(2) For each day on which an unpaid principal balance is outstanding, the lender may charge on that unpaid balance 1/30th of the interest permitted under this subtitle to be charged for 1 month.

(3) For purposes of this section, each of the 12 calendar months in the year shall be treated as having 30 days, as follows:

(i) The last day of each month which has 31 days shall be omitted; and

(ii) The necessary number of days shall be added at the end of February to make 30 days.

(e) *Maximum term of loan.* — The maximum term of any loan made under this subtitle may not exceed:

(1) For any loan with an original principal balance of $700 or less, 30 months and 15 days;

(2) For any loan with an original principal balance of more than $700 but less than $2,000, 36 months and 15 days; and

(3) For any loan with an original principal balance of $2,000 or more, 72 months and 15 days.

## § 12-307. Collection of certain fees.

(a) At the time a loan is made, a lender may collect from the borrower:

(1) As to any item of the total property that secures a loan:

(i) The fees paid to a public official or governmental agency for recording or satisfying a mortgage, encumbrance, or lien on any property securing the loan; or

(ii) An equal or lesser amount for nonfiling insurance premium on any property, or portion of the property, that is not recorded if:

1. The Insurance Commissioner approves the rates; and

2. A commission is not paid on the policy; and

(2) The title insurance premiums or reasonable attorney's fees paid for searching and insuring the title to any real property securing the loan.

(b) A lender may collect from the borrower a fee not exceeding $5 if payment is made with a check that is dishonored on the second presentment.

## § 12-308. Duties of lender.

(a) . . .

(b) . . .

(c) *Prepayment.* — (1) A lender shall permit a borrower to prepay a loan in full or in part at any time, without penalty.

(2) Each partial prepayment shall be applied:

(i) First, to any interest accrued on the unpaid principal balance to the date of the payment; and

(ii) Then, to the unpaid principal balance.

(d) . . .

(e) . . .

## § 12-309. Loan to buy certain goods or services subject to certain defenses.

(a) *Lender subject to defenses of borrower against seller.* — If a lender makes a loan for the purpose of enabling a borrower to buy goods or services used primarily for personal, family, or household purposes, then, in addition to any other claim or defense which the borrower has under this subtitle, the lender is subject to the claims and defenses of the borrower against the seller arising from the sale of the goods or services, if:

(1) The lender knows that the seller arranged for the extension of credit by the lender; or

(2) The lender otherwise knowingly participated in the sale.

(b) *Determination of knowing participation in sale.* — In determining that a lender knowingly participated in a sale transaction, the following factors, among others, may be considered:

(1) The lender was a person related to the seller, unless the relationship was remote or was not a factor in the sale or loan;

(2) The proceeds of the loan were made payable in whole or in part to the seller;

(3) The lender took a purchase-money security interest in the goods which were the subject of the sale;

(4) The seller guaranteed the loan or otherwise assumed the risk of loss by the lender on the loan;

(5) The lender directly supplied to the seller a form used by the borrower to evidence or secure the loan; or

(6) The loan was conditioned on purchase by the borrower of the goods or services from the particular seller, but the payment by the lender of any proceeds of the loan to the seller does not establish in itself that the loan was so conditioned.

(c) *Extent of lender's liability.* — (1) The liability of a lender under this section may not exceed the amount owed to the lender with respect to the sale at the time the lender has notice of a claim or defense of the buyer against the seller.

(2) If two or more loans are consolidated, the maximum amount owed to the lender under paragraph (1) of this subsection is determined as follows:

(i) If the consolidated loans arose from sales made on the same day, the payments received after the consolidation are considered to be applied first to the smallest loan; and

(ii) In any other case, the payments received after the consolidation are considered to be applied first to payment of the loan first made.

(d) *Subrogation of lender.* — The lender is subrogated to each right and remedy which the borrower has against the seller.

## § 12-310. Collateral sale, purchase, or agreement in connection with loan.

(a) *Profit or advantage considered charge.* — For purposes of this subtitle, any profit or advantage which a person contracts for, collects, receives, or obtains by a collateral sale, purchase, or agreement in connection with negotiating, arranging, or making a loan is considered a charge for the loan.

(b) *Exceptions.* — This section does not apply to any commission, dividend, retrospective rating credit, or other consideration received by a licensee or a licensed insurance agent or broker who is an officer, director, agent, employee, or affiliate of a licensee on insurance sold under this subtitle in accordance with the applicable provisions of the Insurance Code.

## § 12-311. Certain security for loan not allowed.

(a) *Confession of judgment; assignment of wages; incomplete instruments.* — A lender may not take as security for a loan any:

(1) Confession of judgment or power of attorney to him or to a third person to confess judgment or appear for the borrower in a judicial proceeding;

(2) Assignment or order for payment of wages;

(3) Instrument in which blanks are left to be filled after execution; or

(4) Note, promise to pay, or security instrument which does not state:

(i) The principal amount of the loan;

(ii) A schedule of payments or a description of the schedule; and

(iii) The agreed amount and rate of interest, charges, and fees.

(b) *Prohibited security interests for certain loans.* — (1) A lender may not take any security interest in:

(i) Real property for any loan under $2,000 in value or amount; or

(ii) Personal property for any loan under $700 in value or amount.

(2) Any lien taken in violation of this subsection is void.

(3) This subsection does not apply to or affect a lien on an interest in real property which results from a judgment obtained by the lender based on a loan otherwise secured or unsecured.

## § 12-312. Insurance.

(a) *Collection of insurance premiums.* — Subject to the provisions of this section, a lender may collect from the borrower, at the option of the borrower, the premiums paid for:

(1) Insurance covering any real or personal property pledged as security for the loans;

(2) Accident and health insurance covering any one borrower, if the insurance does not provide for benefits exceeding the actual period of disability;

(3) Credit life insurance:

(i) Covering any one borrower for any loan under $700 in value or amount; or

(ii) Covering any one or more borrowers for any loan of $700 or more in value or amount; and

(4) Involuntary unemployment benefit insurance covering any one borrower, if the insurance:

(i) Does not provide for benefits exceeding the actual period of unemployment; and

(ii) Is not contingent upon the purchase of any other type of insurance permitted under this subtitle.

(b) *Prohibited and permitted activities by lender; coinsurance or mortgagee clause.* — (1) A lender may not require that the insurance be purchased through a particular broker, agent, or insurance company.

(2) The lender may:

(i) Assist an applicant or act with him in forwarding an application to a broker or agent; and

(ii) Receive and transmit premiums or other identifiable charges for the insurance.

(3) At the option of the borrower, a lender may be coinsured or protected to the extent of his interest by a mortgagee clause.

(c) *Limitations on insurance coverage.* — (1) The amount of property insurance may not exceed either the reasonable value of the property insured or the originally scheduled total of payments under the loan contract. The terms and conditions of the property insurance policy shall be filed with and approved by the Insurance Commissioner. Property insurance may be provided by the lender if the borrower, at the time the loan is made, fails to furnish a loss payable endorsement for the protection of the lender in an amount sufficient to cover the amount of the loan or the value of the property securing the loan, whichever is less. If, however, within 30 days of the inception date of the loan, the borrower does provide a loss payable endorsement for the protection of the lender, and no claim has been filed under the coverage purchased, the lender shall cancel the property insurance on the loan and shall refund the entire original property insurance premium to the borrower. A lender providing property insurance under this section shall give the borrower, at the time the loan is made, a written notice of the borrower's right to provide a loss payable endorsement for the protection of the lender and the borrower's right to a refund of the entire property insurance premium.

(2) Accident and health insurance shall provide for:

(i) Benefits not exceeding the then scheduled unpaid total of payments of the loan;

(ii) A waiting period of at least 14 days; and

(iii) Periodic benefits, the amount of each of which may not exceed the originally scheduled total of payments under the loan contract, divided by the number of installments.

(3) The amount of credit life insurance in force may not exceed the unpaid principal but shall include all accrued interest under the loan contract.

(4) (i) In this paragraph, "involuntary unemployment benefit insurance" means any insurance designed to pay the creditor the monthly payment obligation of the debtor due to the debtor's involuntary loss of employment.

(ii) Involuntary unemployment benefit insurance shall provide that, in the event of involuntary loss of employment, the aggregate amount of periodic benefits payable in the event of involuntary loss of employment, as defined in the policy, may not exceed the then scheduled unpaid total of payments of the loan.

(e) *Delivery of copy of insurance policy.* — Within 25 days after a lender has charged for any insurance in connection with a loan, he shall deliver a copy of the appropriate policy or certificate to the borrower.

## § 12-313. Prohibited charges and transactions; when contract void.

(a) *Prohibition.* — With respect to any loan, a lender may not:

(1) Directly or indirectly contract for, charge, or receive any interest, discount, fee, fine, commission, charge, brokerage, or other consideration in excess of that permitted by this subtitle;

(2) Divide into separate parts any contract made for the purpose or with the effect of obtaining charges in excess of those permitted by this subtitle; or

(3) . . .

(b) . . .